USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/19/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

ALLIANZ RISK TRANSFER (BERMUDA) LIMITED,

                      Plaintiff,

         -against-

HIGH LONESOME WIND POWER, LLC,

                    Defendant.

-------------------------------------------------------------------- X

1:22-cv-5133-GHW

MEMORANDUM
OPINION & ORDER

GREGORY H. WOODS, United States District Judge:

High Lonesome Wind Power, LLC ("High Lonesome"), is a wind power producer in Texas. It entered into a swap transaction with Allianz Risk Transfer (Bermuda) Limited ("Allianz"). Their swap agreement contained a dispute resolution provision requiring that "any" dispute regarding the calculation of the amount due under the contract be resolved by an arbitrator selected by the parties, or in the event that they failed to agree on the choice of arbitrator, by the American Arbitration Association. But when a dispute arose about a bill for nearly $125 million, the parties' relationship collapsed. Allianz took the position that the parties' arbitration agreement simply did not apply to their dispute and filed this action. High Lonesome moved to compel arbitration. Because the parties' arbitration agreement unambiguously requires the arbitration of their dispute regarding the amount of the bill, the defendant's motion to compel arbitration is GRANTED.

I.      BACKGROUND

      A.      Factual Background[1]

            1.  The Parties and the Proxy Revenue Swap Arrangement

In October 2018, Allianz Risk Transfer (Bermuda) Limited ("Allianz" or "Plaintiff") entered into a "proxy revenue swap" transaction with High Lonesome Wind Power, LLC ("High Lonesome" or "Defendant").  Declaration of Antonio J. Perez-Marques ("Perez Decl."), Dkt. No. 24, Exs. A–D.  The terms of the swap were set forth in a series of interrelated agreements:  a form ISDA 2002 Master Agreement, dated October 10, 2018 (the "Master Agreement"), Perez Decl. Ex. B; an Amended and Restated Scheduled to the Master Agreement (the "Schedule"), Perez Decl. Ex. C; and an Amended and Restated Confirmation (the "Confirmation"), Perez Decl. Ex. A.[2]  *See also* Complaint ("Compl."), Dkt. No. 1-1 ¶ 21.

Broadly speaking, pursuant to the swap transaction, "the parties agreed to make payments to each other based upon the 'proxy,' or hypothetical, revenue of a wind farm project operated by [High Lonesome] in Texas."  Compl. ¶ 1.  The amount that each party was required to pay was determined by reference to two principal variables:  the market price of electricity and wind speed.  *Id.* ¶ 23.  The parties selected a "Calculation Agent" to calculate the amount to be paid out by each of the parties under the swap, as required by the Confirmation.  REsurety, Inc. ("REsurety"), an independent third party unaffiliated with either Allianz or High Lonesome, was retained by the parties to serve in that role.

---

[1] Unless otherwise noted, the facts described below are undisputed.  The Court refers to allegations in the complaint for the purpose of providing context for the benefit of the reader, but for all other purposes, the Court relies on the facts presented by the parties in connection with the briefing of this motion.
[2] All of these agreements are governed by New York law.  *See* Schedule Part 4(h); Master Agreement § 13(a); Confirmation at 1.

###### 2.   The Black Swan:  High Wind, High Prices, Limited Actual Revenues

This case is the product of what Defendant fairly characterizes as a "black swan" event.  In February 2021, Texas was struck by Winter Storm Uri.  Compl. ¶ 40.  Electricity demand spiked, while production levels tanked.  *Id.*  To spark increased production, the Electric Reliability Council of Texas ("ERCOT") set very high electricity rates.  *Id.* ¶ 43.  The storm was windy.  But because its turbines were not operating, High Lonesome's windfarm did not produce much power.  *Id.* ¶ 45.  "Meanwhile, regardless of whether the Project's turbines were operational, Proxy Revenue continued to accrue under the terms of the Proxy Revenue Swap because the swap is not based on actual generation or revenues."  *Id.* ¶ 46.  Considering the high wind speed and energy prices, the Calculation Agent, REsurety, issued an interim report for the month of February 2021, indicating that proxy revenue for the month was $125,023,165.[3]  *Id.*  When the Calculation Agent issued its final settlement report for the first quarter of 2021, it calculated that High Lonesome owed Allianz $129,833,815.  *Id.*

###### 3.   The Dispute and the Dispute Resolution Process

Perhaps unsurprisingly, the enormous bill triggered a dispute.  Section 10 of the Confirmation contains a detailed dispute resolution procedure.[4]  First, a disputing party must provide notice:

---

[3] Meanwhile, the Complaint alleges on information and belief that High Lonesome generated only approximately $16 million in actual revenues.  Compl. ¶ 45.

[4] The full text of Section 10 of the Confirmation, which is the focus of this motion, is set forth here:

**10.  Dispute Resolution**

The actions, calculations and determinations of the Calculation Agent hereunder shall be subject to review by both Party A and Party B.  If any action, calculation or other determination of the Calculation Agent is disputed in good faith by either Party (the "Disputing Party"), then the Disputing Party shall deliver, no later than thirty (30) days after the delivery of the relevant Settlement Report or thirty (30) days after the relevant action, calculation or determination if not part of a Settlement Report:  (i) its written objection (the "Dispute Notice") to the Calculation Agent and the other Party (the "Non-Disputing Party"), specifying in reasonable detail:  (a) its objection, together with supporting calculations or information; and (b) its proposed calculation or resolution; and (ii) a statement of the amount which is not in dispute.  Any undisputed amounts shall be paid when due.

Upon delivery of a Dispute Notice, the Disputing Party and the Non-Disputing Party shall consult with each other and the Calculation Agent in an attempt to resolve the dispute in good faith. If the Disputing Party, the Non-Disputing Party and the Calculation Agent fail to resolve the dispute within ten (10) Local Business Days after delivery of the Dispute Notice, then Party A and Party B shall as promptly as practicable (in ten (10) additional Local Business Days or less) agree upon a wind resource assessment or independent engineering consultant that is recognized as having expertise in the U.S. wind energy industry (the "Independent Consultant") to resolve the dispute. In the event that Party A and Party B cannot mutually agree on an Independent Consultant in such time period, Party A and Party B shall each select an Independent Consultant in such time period and those two Independent Consultants shall mutually agree upon a different Independent Consultant to resolve the dispute. In the event that the two Independent Consultants selected by Party A and Party B pursuant to the preceding sentence cannot mutually agree upon a third Independent Consultant in such time period, then Party A and Party B shall engage American Arbitration Association solely for the purpose of selecting such third Independent Consultant in accordance with the requirements of this Section 10 and the Commercial Arbitration Rules and Mediation Procedures. The Disputing Party, as promptly as practicable, shall engage such Independent Consultant to resolve the dispute as promptly as practicable.

Information provided to the Independent Consultant shall be subject to reasonable confidentiality requirements as requested by Party A, Party B or the Calculation Agent, which may include restrictions on the sharing of certain proprietary information with Party A, Party B or the Calculation Agent, solely to the extent the sensitivity of such information cannot be adequately protected by confidential treatment by Party A, Party B or the Calculation Agent as a receiving party.

In making its determination, the Independent Consultant shall be bound by the terms of this Confirmation and, without any additional or supplemental submittals by either Party, may consider available legal and industry matters as in its opinion are necessary or appropriate to make a proper determination. By the thirtieth (30th) day following the submission of the matter to the Independent Consultant, applying the principles set forth in this Section 10, the Independent Consultant shall make a determination of the matter submitted. The decision of the Independent Consultant shall be in writing and conclusive and binding on Party A and Party B and shall be enforceable against the Parties in any court of competent jurisdiction.

If the Independent Consultant concludes that the original action, calculation or determination of the Calculation Agent was (i) performed in accordance with this Confirmation and (to the extent not specified in the Confirmation or any other written agreement executed by both parties) the intentions of the Parties on the date of this Confirmation, and (ii) did not contain any errors or faulty assumptions or information in aspects of the calculation or determination resulting in an incorrect result, then the Calculation Agent's original action, calculation or determination shall be used for purposes of the relevant Transaction and the dispute will be deemed to have been resolved, and any unpaid disputed amount shall be paid within five (5) Local Business Days after such resolution. In this case, the Disputing Party shall bear all costs and expenses incurred by the Independent Consultant in connection with the relevant dispute.

If the Independent Consultant concludes that the original action, calculation or determination of the Calculation Agent was (i) not performed in accordance with this Confirmation or (to the extent not specified in the Confirmation or any other written agreement executed by both parties) the intentions of the Parties on the date of this Confirmation, or (ii) contained errors or faulty assumptions or information in aspects of the calculation or determination resulting in an incorrect result, then the Independent Consultant's action, calculation or determination shall be used for purposes of the relevant Transaction and the dispute will be deemed to have been resolved, and the unpaid disputed amount shall be paid within five (5) Local Business Days of such resolution. In this case, the Non-Disputing Party shall promptly reimburse the Disputing Party for the costs and expenses of the Independent Consultant in connection with the relevant dispute.

The dispute resolution procedures set forth in this Section 10 shall be the exclusive procedure for resolving any dispute related to the actions, calculations and determinations of the Calculation Agent under this Confirmation.

In the event that the Independent Consultant(s) are unable to render their conclusion pursuant to the dispute resolution procedures set forth in this Section 10 within ninety (90) days of delivery of a Dispute Notice, the disputed portion of the Cash Settlement Amount shall be paid by the relevant Party to the other Party, pursuant to the information contained in the Settlement Report that is the subject of the Dispute Notice within three (3) Local Business Days, subject to reconciliation, refund or adjustment upon determination by the Independent Consultant(s).

> If any action, calculation or other determination of the Calculation Agent is disputed in good faith by either Party (the "Disputing Party"), then the Disputing Party shall deliver, no later than thirty (30) days after the delivery of the relevant Settlement Report or thirty (30) days after the relevant action, calculation or determination if not part of a Settlement Report:  (i) its written objection (the "Dispute Notice") to the Calculation Agent and the other Party (the "Non-Disputing Party"), specifying in reasonable detail:  (a) its objection, together with supporting calculations or information; and (b) its proposed calculation or resolution; and (ii) a statement of the amount which is not in dispute.  Any undisputed amounts shall be paid when due.

Confirmation § 10.  The parties then have 10 days to work together to resolve the disputed issue amicably.  *Id.*

If the parties are unable to work the issue out on their own, the Confirmation requires that the parties submit the issue to an "Independent Consultant" for resolution.  *Id.*  The Independent Consultant must be "a wind resource assessment or independent engineering consultant that is recognized as having expertise in the U.S. wind energy industry."  *Id.*  If the parties are unable to agree upon someone to serve as the Independent Consultant, the Confirmation provides that each should "select an Independent Consultant in such time period and those two Independent Consultants shall mutually agree upon a different Independent Consultant to resolve the dispute."  *Id.*  And if that doesn't work, then the parties "shall engage American Arbitration Association solely for the purpose of selecting such third Independent Consultant."  *Id.*

The Independent Consultant is required to reach a decision regarding the dispute within 30 days after the submission of the issue to it.  *Id.*  "In making its determination, the Independent Consultant shall be bound by the terms of this Confirmation and, without any additional or supplemental submittals by either Party, may consider available legal and industry matters as in its opinion are necessary or appropriate to make a proper determination."  *Id.*  "The decision of the Independent Consultant shall be . . . conclusive and binding on" the parties.  *Id.*

The Confirmation states that Section 10 is the sole procedure for resolving disputes related to determinations by the Calculation Agent:  "The dispute resolution procedures set forth in this

Section 10 shall be the exclusive procedure for resolving any dispute related to the actions, calculations and determinations of the Calculation Agent under this Confirmation." *Id.*

The parties began the dispute resolution process laid out in the Confirmation, but the process quickly sputtered, then stopped. On April 21, 2021, High Lonesome delivered a dispute notice challenging most of the $125,023,165 cash settlement amount determined by the Calculation Agent. Declaration of Piero Guerritore, Dkt. No. 25 ("Guerritore Decl.") ¶ 3.[5] The parties conferred but were not able to reach a resolution. *Id.* ¶¶ 5–10.

The parties also could not agree on an Independent Consultant to whom they could submit the dispute. High Lonesome proposed two potential candidates—both wind engineering experts. Perez Decl. Ex. J. Even at this early stage of the dispute resolution process, Allianz told High Lonesome that it would require payment "notwithstanding" the ultimate determination of the Calculation Agent.[6] Perez Decl. Ex. I p. 2. Allianz's counsel also peppered its correspondence with questions regarding whether the dispute raised by High Lonesome was brought in "good faith," alluding to one of the arguments that Allianz is now pursuing in this motion—namely, that only "good faith" disputes are subject to Section 10's dispute resolution process.[7] Perez Decl. Ex. O. Nonetheless, Allianz countered with two alternatives for the role of Independent Consultant, both of whom were economic consultants, based on its view that "a wind engineer is not the proper individual to perform this role." *Id.* The parties could not agree on an Independent Consultant.

The next step in the dispute resolution process required the parties' Independent Consultants to work together to identify a third who could hear the dispute. Before that could take

---

[5] The Court understands that High Lonesome paid the amount due that was not in dispute.
[6] Perez Decl. Ex. I p. 2 (Allianz's counsel writing that the company "does not believe any reasonable dispute exists regarding the calculation of the Market Price, and accordingly asserts that the full Cash Settlement Amount was payable on April 30, 2021 notwithstanding the determination of the Independent Consultant in accordance with Section 10.").
[7] Perez Decl. Ex. O ("[Allianz] does not understand what could be the good faith basis for this purported dispute. . . . As evidenced by your reference to the Confirmation Services Agreement and not the Confirmation, there is no good faith basis in the Confirmation for any dispute other whether actual generation should be used in the calculation of the Cash Settlement Amount.").

place, however, Allianz claimed that High Lonesome's failure to pay the disputed amount had resulted in an event of default under the swap documents.  Perez Decl. Ex. M.  On June 15, 2021, Allianz drew over $51 million from a letter of credit that High Lonesome had posted to secure its obligation under the swap because of that alleged default.  *Id.*

Pointing to Section 9 of the Confirmation, High Lonesome took the position that payment of only the undisputed amount was required, and that, therefore, Allianz's draw upon the letter of credit was inappropriate.  *See* Perez Decl. Ex. M; Confirmation § 9 ("The Cash Settlement Amount (*or, if the calculation of the Cash Settlement amount is under dispute, the undisputed portion thereof*) shall be paid . . . on or before the fifth . . . Local Business Day following receipt of the relevant Settlement Report." (emphasis added)).  In a letter dated June 17, 2021, High Lonesome told Allianz that Allianz had triggered a Potential Event of Default under the swap documents "[b]y failing to participate in the Section 10 dispute resolution process, [and] by falsely declaring an Event of Default under the Master Agreement without notice and when High Lonesome has paid all amounts currently due . . . ."  Perez Decl. Ex. N at 2.  High Lonesome informed Allianz that it if failed to "cure these breaches in full by July 17, 2021," it could terminate the swap arrangements.  *Id.*

Against that contentious backdrop, the Independent Consultants selected by each of the parties could not agree on a third Independent Consultant.  Because of the impasse, the Confirmation required the parties to turn to the American Arbitration Association (the "AAA") to appoint an Independent Consultant to resolve the dispute.  High Lonesome started that process on July 1, 2021 by sending Allianz a proposed simple form to engage the AAA to select the Independent Consultant.  Perez Decl. Ex. V.

Allianz responded on July 8, rejecting High Lonesome's proposed submission to the AAA. Allianz described it as constituting "further evidence of HL's lack of good faith in its performance of its obligation under the Confirmation, including HL's clear and unambiguous payment

obligations and its obligations under Section 10." Perez Decl. Ex. O. Allianz rejected the proposed submission to the AAA in part because it was too straightforward: "HL has failed to include sufficient details of the nature and scope of HL's dispute to allow AAA to select appropriately qualified candidates." *Id.* at 2. Allianz also rejected the submission because it referenced Section 10's requirement that the Independent Consultant be "a wind resource assessment or independent engineering consultant that is recognized as having expertise in the U.S. wind energy industry." Perez Decl. Ex. N. Notwithstanding the language of the Confirmation defining the qualifications of the Independent Consultant, in Allianz's view, there was "no good faith basis for HL to equate those qualifications with the qualifications necessary to resolve the issues that HL claims are in dispute . . . ." Perez Decl. Ex. O at 2.

On July 15, 2021—just two days before the deadline for Allianz to withdraw its event of default that High Lonesome had established in its letter the month before—Allianz blinked. Allianz sent a letter to High Lonesome saying that it had returned the $51,625,000 that it had drawn on the letter of credit. Perez Decl. Ex. P. And on July 17, 2021, Allianz formally withdrew its notice of default. Perez Decl. Ex. Q. Allianz stated that it was "agreeing to proceed with the Section 10 process to address the parties' dispute regarding amounts owed by [High Lonesome]." *Id.* Allianz communicated that its counsel would reach out to High Lonesome's team regarding the required submission to the AAA. *Id.*

This resolution was not satisfactory to High Lonesome. On July 19, 2021, it sent a letter to Allianz notifying it of the occurrence an event of default under the Confirmation, and calling for early termination of the transaction. Perez Decl. Ex. R. In High Lonesome's view, the consequence of its early termination was that it was no longer required to pay the disputed amount: only the undisputed amounts were due to be paid prior to the termination of the swap. *Id.* at 2. High Lonesome identified several grounds for the event of default: (1) Allianz's asserted "failure to

comply with Section 10 of the Confirmation, which requires the parties to agree upon an Independent Consultant 'as practically as practicable,' and to follow specified procedures set forth in the Confirmation"; (2) Allianz's asserted insistence "on the right to make a unilateral submission to the American Arbitration Association, although Section 10 states that the Parties 'shall engage [the] American Arbitration Associate solely for the purpose of selecting such third Independent Consultant'"; and (3) Allianz's failure to pay interest on the funds that it had drawn from the letter of credit. *Id.* at 2–3.

Allianz responded with its own notice of events of default and termination of the swap on July 29, 2021. *See* Perez Decl. Ex. S. In subsequent correspondence, High Lonesome repeated its position that any disputed payment amount would have to be "first resolved by the Independent Consultant." *Id.* at 2; *see also* Exs. T at 3 and U at 2. According to High Lonesome, Allianz "neither responded to any of these letters, returned the form needed to engage the AAA, nor made any other efforts to continue the Section 10 process . . . ." Dkt. No. 23 ("D. Mem.") at 11.

### 4. Procedural History

Allianz first filed this case in state court in May 2022—about 10 months after the parties declared their dueling termination events and their efforts to deploy the Confirmation's dispute resolution procedures had failed. Dkt. No. 1. The case was removed to this Court by High Lonesome. *Id.* High Lonesome answered the complaint after the case was removed. Dkt. No. 14 (the "Answer"). In its Answer, among other affirmative defenses, High Lonesome asserted that "Allianz's claims are barred, in part, by the alternative dispute resolution provision in Section 10 of the Confirmation, which is 'the exclusive procedure for resolving any dispute related to the actions, calculations and determinations by the Calculation Agent.'" Answer at 17.

High Lonesome filed this motion to compel arbitration of the amount due under the Confirmation and to stay all litigation related to that issue. Dkt. No. 22 (notice of motion). In its

motion, High Lonesome argues that the dispute resolution provision unambiguously requires that "any" dispute involving a determination by the Calculation Agent be resolved through arbitration. D. Mem. at 14.  Anticipating Allianz's position, High Lonesome contends that the Confirmation does not require that only "good faith" disputes be resolved through its dispute resolution procedure.  *Id.* at 15–18.  In the alternative, High Lonesome argues that if the Confirmation's dispute resolution procedure applies only to issues "disputed in good faith," that the requirement "must refer to a standard no higher than Rule 11, which, if anything, is even 'more stringent than the original good-faith formula.'"  *Id.* at 18 (quoting Fed. R. Civ. Pro. 11 Advisory Committee Note). Finally, High Lonesome refutes Allianz's argument that High Lonesome waived its right to arbitrate: "The suggestion that High Lonesome waived rights that it sought for months to enforce, repeatedly and expressly preserve, and now brings this motion to vindicate is legally and factually baseless."  *Id.* at 21.

Allianz opposed the motion.  Dkt. No. 29 ("Opp.").  In its opposition, Allianz argues that only issues "disputed in good faith" are subject to the Confirmation's dispute resolution provision. Opp. at 8–11.  Allianz contends that the "good faith" requirement should be read in a manner consistent with the implied covenant of good faith and fair dealing in New York contracts.  *Id.* at 11. Because the implied covenant of good faith "does not imply an obligation inconsistent with other terms of the contractual relationship," Allianz contends that any dispute "contrary to the plain language of the agreement is not brought in good faith."  *Id.* (citations omitted).  Allianz argues that High Lonesome's position is contradicted by the language of the Confirmation, and therefore cannot be resolved through the agreement's dispute resolution provision.

Allianz also argues that High Lonesome repudiated its right to arbitrate.  *Id.* at 18.  Allianz contends that High Lonesome improperly "conditioned its participation in the Section 10 process on [Allianz's] agreement to two terms found nowhere in Section 10."  *Id.* at 19.  These

10

"extracontractual conditions" that High Lonesome allegedly imposed were an insistence that Allianz

relinquish its right "to provide the AAA with information relevant to the selection of the

Independent Consultant" and "to make a submission to the Independent Consultant . . . ."  *Id.*  The

motion was fully briefed when High Lonesome filed its reply.  Dkt. No. 30.

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation

of any contract."  9 U.S.C. § 2.  The FAA provides the following:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate
> under a written agreement for arbitration may petition any United States district
> court which, save for such agreement, would have jurisdiction under Title 28, in a
> civil action or in admiralty of the subject matter of a suit arising out of the
> controversy between the parties, for an order directing that such arbitration proceed
> in the manner provided for in such agreement.

9 U.S.C. § 4.  A party has "refused to arbitrate" within the meaning of Section 4 if it "commences

litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so."

*LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004) (citation and brackets

omitted); *see also Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004) (finding petitioner did

not refuse to arbitrate where respondents had neither commenced litigation nor failed to comply

with an order to arbitrate).

In ruling on a petition to compel arbitration under the FAA, district courts are "limited to

determining two issues:  i) whether a valid agreement or obligation to arbitrate exists, and ii) whether

one party to the agreement has failed, neglected, or refused to arbitrate."  *Shaw Grp. Inc. v. Triplefine*

*Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003) (internal quotation marks and citation omitted).  It is well

settled that "arbitration is a matter of contract, and that parties cannot be compelled to arbitrate

issues that they have not specifically agreed to submit to arbitration."  *Id.* at 120 (internal quotation

marks and citations omitted); *accord Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 567 (S.D.N.Y.

2013).  If the court determines "that an arbitration agreement is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate." *Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 75 (S.D.N.Y. 2015) (quotation omitted).

"The question of whether the parties have agreed to arbitrate, *i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  "This principle flows inexorably from the fact that arbitration is simply a matter of contract between the parties." *Id.* (quotation and brackets omitted); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that "arbitration is a matter of contract" (quotation omitted)).  Hence, "[t]he threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles." *Nicosia*, 834 F.3d at 229 (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 27 (2d Cir. 2002)).

But "[t]he Supreme Court has repeatedly instructed that the FAA 'embodies a national policy favoring arbitration.'" *Id.* at 228–29 (quoting *AT&T Mobility LLC*, 563 U.S. at 346); *see also Preston v. Ferrer*, 552 U.S. 346, 349 (2008) (the FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution").  And "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).  "Accordingly, federal policy requires us to construe arbitration clauses as broadly as possible." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995)).

In evaluating a motion to compel arbitration, courts "apply a 'standard similar to that applicable for a motion for summary judgment.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia*, 834 F.3d at 229).  This means the Court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to

interrogatories, and admissions on file, together with . . . affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.* (internal quotations omitted). "If undisputed facts in the record require[] the issue of arbitrability to be resolved against the Plaintiff as a matter of law," then the court must grant the motion to compel arbitration. *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 561–62 (S.D.N.Y. 2013) (courts "must grant a motion to compel arbitration" when there are no genuine issues of material fact and the moving party is clearly entitled to arbitration as a matter of law); *Khanna v. Am. Exp. Co.*, No. 11-cv-6245 (JSR), 2011 WL 6382603, at *1 (S.D.N.Y. Dec. 14, 2011) (same).

On the other hand, "if there is a disputed question of material fact, such that 'the making of the arbitration agreement . . . [is] in issue,' then 'the court shall proceed summarily to the trial thereof.'" *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49 (2d Cir. 2022) (quoting 9 U.S.C. § 4). In considering whether there is an issue of fact, "[t]here is nothing . . . to suggest that nonmovants' affidavits alone cannot—as a matter of law—suffice to defend against" such a motion. *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998). However, "where 'the facts alleged' in a nonmovant's declaration 'are so contradictory that doubt is cast upon their plausibility,' then absent other evidence, granting the motion to compel may be appropriate." *Barrows*, 36 F.4th at 51 (quoting *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (per curiam)).

Courts in this Circuit engage in the following inquiry:

> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998)).

The party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010); *accord Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.").

### III.   DISCUSSION

#### A.   The Parties Are Required to Arbitrate Any Disputed Determinations by the Calculation Agent

The unambiguous language of the Confirmation requires the parties to arbitrate "any" dispute regarding a determination by the Calculation Agent—including the one at issue in this case. Under New York law, the interpretation of a contract requires a court to address "the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (quotations omitted); *accord, e.g., W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts."). Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993); *see also Breed v. Ins. Co. of No. Am.*, 46 N.Y.2d 351, 355 (1978) (noting that no ambiguity exists when contract language has "a definite and precise meaning" about which "there is no reasonable basis for a difference of opinion"). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).

A court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Bank of New York Mellon v.*

14

*WMC Mortg., LLC*, No. 12CV7096 DLC, 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015)

(quoting *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992)).  Rather, "a written agreement

that is complete, clear and unambiguous on its face must be enforced according to the plain

meaning of its terms."  *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009)

(quotation omitted).

      The arbitration provision of the Confirmation is unambiguous, and it requires the arbitration

of this dispute.  Section 10 of the Confirmation provides the following:  "The dispute resolution

procedures set forth in this Section 10 shall be the exclusive procedure for resolving *any* dispute

related to the actions, calculations and determinations of the Calculation Agent under this

Confirmation."  Confirmation § 10 (emphasis added).  The language could hardly be more clear:

"any" is used in the text with its common meaning—namely "one or some indiscriminately of

whatever kind: a:  one or another taken at random . . . .  b:  EVERY—used to indicate one selected

without restriction . . . ."  Merriam-Webster Online Dictionary.  The Confirmation requires that all

disputes regarding determinations by the Calculation Agent be resolved through the process outlined

in Section 10:  this is one.

      Allianz misreads a part of the Confirmation's description of the arbitration process as an

implicit limitation on the scope of claims that are subject to arbitration.  Six paragraphs before the

declaratory statement quoted above, the following language appears:  "*If* any action, calculation or

other determination of the Calculation Agent is disputed *in good faith* by either Party (the 'Disputing

Party'), then the Disputing Party *shall* deliver, no later than thirty (30) days after the delivery of the

relevant Settlement Report or thirty (30) days after the relevant action, calculation or determination

if not part of a Settlement Report:  (i) its written objection (the 'Dispute Notice') to the Calculation

Agent and the other Party . . . ."  Confirmation § 10 (emphasis added).  Allianz reads the "in good

faith" language in this provision to mean that only disputes brought in good faith are subject to arbitration.  This argument is unpersuasive for multiple reasons.

First, as described above, the Confirmation contains a clear, unambiguous declaratory statement establishing that "any" disputes regarding determination by the Calculation Agent must be resolved pursuant to Section 10.  The description of a portion of the arbitration process upon which Allianz relies appears six paragraphs above that statement in the text.  It does not modify that clear statement.

Second, Allianz misreads the language upon which it relies:  the sentence governs timing for commencement of a dispute resolution process.  "If" a party in good faith disputes a determination it "shall" deliver a Dispute Notice.  The word "shall" mandates that the notice be provided within a particular time period.[8]  There is no dispute that High Lonesome delivered its dispute notice within 30 days after learning of the basis for its dispute.[9]

Third, Allianz's proposed interpretation of the contract is inconsistent with other provisions of the contract.  As described above, Section 9 of the Confirmation requires payment of the "undisputed portion" of the Cash Settlement Amount, "if the calculation of the Cash Settlement Amount is under dispute . . . ."  Confirmation § 9.  The Confirmation does not limit payments only if the amount is under "good faith" dispute, and it is therefore inconsistent with Allianz's construction of the contract.

Fourth, while the text of the contract dictates the outcome here, the Court observes that Allianz's position does not make a lot of sense.  Again, Allianz argues that the dispute resolution

---

[8] Allianz interprets this sentence as if it were drafted differently.  For example:  "*Only* if a Party disputes in good faith a determination by the Calculation *may* the disputing party deliver a notice . . . ."  The Court interprets it using the words selected by the parties in drafting the contract.

[9] Why the drafters did not include a temporal limitation for disputes not brought in good faith is not a question presented to the Courts.  It seems unlikely that a party would choose to argue that its adversary's dispute was not subject to the temporal limitation, however.

provision applies only to disputes made in "good faith."  And Allianz contends that only the arguments by its adversary that Allianz agrees to be supported by the text of the contract can be said to have been made in good faith.  In sum, Allianz asserts that the parties contracted to a dispute resolution protocol that would apply only if both parties agreed that the other's position was supported by the contract.  Such a dispute resolution procedure would be unusual because it would not cover many—and maybe not any—disputes.  The text of the contract makes clear that the parties did not agree to such an odd arrangement.

## B.    Repudiation Must Be Resolved by the Arbitrator

Allianz's argument that High Lonesome repudiated its right to arbitrate its dispute is a "gateway matter," rather than a question of arbitrability.  Therefore, it is an issue that must be resolved by the arbitrator, not the Court.  "The Supreme Court has distinguished between 'questions of arbitrability,' which are to be resolved by the courts unless the parties have clearly agreed otherwise, and other 'gateway matters,' which are presumptively reserved for the arbitrator's resolution."  *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393–94 (2d Cir. 2011) (internal quotations and citations omitted).  "'Questions of arbitrability' is a term of art covering 'dispute[s] about whether the parties are bound by a given arbitration clause' as well as 'disagreement[s] about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'"  *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).  "Those issues should be decided by the courts unless 'there is clear and unmistakable evidence from the arbitration agreement . . . that the parties intended that [they] be decided by the arbitrator.'"  *Id.* (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002)).

"On the other hand, 'the phrase "question of arbitrability" [is] not applicable . . . where parties would likely expect that an arbitrator would decide the gateway matter.  Thus procedural questions which grow out of the dispute and bear on its final disposition are presumptively not for

the judge, but for an arbitrator, to decide.'" *Id.* (quoting *Howsam*, 537 U.S. at 84); *see also DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021). Repudiation is such a "gateway" procedural matter. In *Mulvaney Mech., Inc. v. Sheet Metal Workers International Ass'n, Loc. 38*, the Second Circuit squarely held that "the issue of repudiation most closely resembles the defenses to arbitrability such as waiver, estoppel, or delay that the Supreme Court listed as questions properly decided by arbitrators." 351 F.3d 43, 46 (2d Cir. 2003).[10]

Because the issue of arbitrability was left to the Court by the parties, the Court was empowered to conclude that this dispute falls within the scope of the parties' arbitration agreement. The "gateway" procedural issue of whether High Lonesome repudiated its right to arbitrate, however, is, by default, reserved for the arbitrator to resolve.

### C.  The Proceedings Are Stayed as to Issues Subject to Arbitration Agreement

Finally, High Lonesome has requested that the Court stay all litigation "related to the actions, calculations, and determinations of the Calculation Agent in calculating the Q1 2021 Cash Settlement Amount pursuant to 9 U.S.C. § 3 . . . ." D. Mem. at 25. The Court refers to those matters as the "Disputed Determinations." The FAA provides that:

> [T]he court . . . upon being satisfied that the issue . . . is referable to arbitration under . . . an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]

9 U.S.C. § 3. Under this provision, "a stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015).

---

[10] Some courts in this Circuit (including this one) have ruled on whether a party's post-litigation conduct has resulted in the waiver of an arbitration agreement notwithstanding the Second Circuit's decision in *Mulvaney*. *See, e.g.*, *Schreiber v. Friedman*, No. 15CV6861CBAJO, 2017 WL 5564114, at *8–9 (E.D.N.Y. Mar. 31, 2017) (collecting cases). But neither the Court nor the parties have identified a ruling in this Circuit after *Mulvaney* in which the issue of a party's purported pre-litigation repudiation of an arbitration agreement has been resolved by the court, rather than being reserved for decision by the arbitrator.

Because the Court has determined that disputes related to the determination by the Calculation Agent are subject to the Confirmation's mandatory arbitration provision, the Court stays all litigation related to the Disputed Determinations.

## IV.   CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to compel arbitration of the Disputed Determinations.  Litigation regarding the Disputed Determinations is stayed, pending the outcome of the arbitration proceedings.  The parties are ordered to submit a joint status letter to the Court no later than April 11, 2024 with their respective views regarding how any remaining issues in this matter may be litigated.

The Clerk of Court is directed to terminate the motion at Dkt. No. 22.

SO ORDERED.

Dated:  March 19, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge

19