UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                         :
ALLIANZ RISK TRANSFER (BERMUDA)                          :
LIMITED,                                                 :
                                                         :
                                Plaintiff,               :    No. 1:22-cv-05133 (GHW)
                                                         :
                - against -                              :    **<u>AMENDED COMPLAINT</u>**
                                                         :
HIGH LONESOME WIND POWER, LLC,                           :
                                                         :
                                Defendant.               :
                                                         :
-----------------------------------------------------------------x

Plaintiff Allianz Risk Transfer (Bermuda) Limited (**"ART"**), by and through its

undersigned attorneys Friedman Kaplan Seiler & Adelman LLP, for its complaint against

defendant High Lonesome Wind Power, LLC (**"HL"**), alleges as follows upon knowledge as to

ART and its acts, and as to all other matters upon information and belief:

## <u>NATURE OF THE ACTION</u>

1.      This action arises out of a "proxy revenue swap" transaction, in which the

parties agreed to make payments to each other based upon the "proxy," or hypothetical, revenue

of a wind farm project operated by HL in Texas.  The proxy revenue was to be determined based

upon a contractual formula involving application of several specified inputs, including electricity

prices and wind speeds, but not actual revenue.  Generally speaking, under the terms of the swap,

if electricity prices and wind speeds were sufficiently low (subject to a specified minimum

price), ART would make a payment to HL; conversely, if prices and wind speeds were

sufficiently high (without application of any contractual maximum price), HL would make a

payment to ART.  Through this swap transaction, HL hedged against the risks of low prices and

low wind speeds, while ART agreed to bear those risks in exchange for being paid when prices and wind speeds were high.

2.      Under the plain terms of the proxy revenue swap transaction, HL took the risk that the turbines at its wind farm would fail to actually operate, for any and all reasons. Now, however, HL seeks to re-write the contract to shift that risk to ART after the turbines failed to operate during a winter storm in Texas in February 2021 (**"Winter Storm Uri"**), when prices were high and HL therefore incurred a payment obligation to ART of approximately $130 million (as determined by REsurety, Inc., an independent third-party calculation agent designated by the parties), while the wind farm generated little to no actual revenue.

3.      HL disputed its obligation to make this payment based on two principal arguments, neither of which has merit.  First, HL asserted that the parties intended to shift what it calls "all weather-related" risk to ART, even though the contract does not say that.  Second, HL asserted that the electricity prices determined by the relevant regulatory authority in Texas—the Electric Reliability Council of Texas (**"ERCOT"**)—should not be used to determine its payment obligations, even though the contract plainly states that the relevant prices are those "determined by" ERCOT.

4.      Notwithstanding HL's baseless and bad-faith arguments, ART was prepared to follow the detailed dispute resolution procedures set forth in the parties' contract, which provided for certain disputes to be resolved by an "Independent Consultant."  Instead, HL short-circuited and abandoned that process, trumping up allegations of default by ART (based upon an allegedly premature drawdown on a letter of credit posted by HL, which ART promptly reversed, timely curing any supposed default) and purporting to terminate the proxy revenue

4857-5858-0701.1

swap transaction before the Independent Consultant could even be chosen. HL's purported termination is invalid.

5.      HL complains that ART defaulted when it reserved its rights to provide critical information about the parties' dispute to the American Arbitration Association (**"AAA"**), to which the parties' contract assigns the duty to appoint the Independent Consultant when the parties cannot do so consensually, as happened here. ART was well within its rights to seek to provide essential context to the AAA, especially when HL wanted to conceal it, telling the AAA nothing more than that the dispute is about a "contract," and not a single word more.

6.      HL also asserts that ART defaulted when it reserved its right to make a submission of its own to the Independent Consultant, in response to HL's 300-plus-page Dispute Notice. HL had no right to insist, as it did, that the dispute be resolved based solely upon its one-sided presentation, especially when the contract expressly contemplates submissions to the Independent Consultant by both parties.

7.      Finally, HL asserts that ART defaulted when it failed to pay interest on allegedly prematurely drawn letter of credit proceeds at the "Default Rate." But ART *did* make a timely interest payment when HL provided notice of its belief that interest was due, even though HL had not previously demanded interest and ART believed no interest was due.

8.      In short, HL's arguments as to both the merits and the contractual procedure fail. It is HL that has defaulted—by failing to pay amounts due under the proxy revenue swap and failing to post required credit support (in the form of cash or a new letter of credit)—and on the basis of those defaults, ART properly terminated the parties' agreement. As a result, HL owes ART a termination payment totaling over $200 million. HL has failed and refused to make this payment, and ART therefore has commenced this action.

4857-5858-0701.1

## PARTIES

9.    Plaintiff ART is an exempted limited liability company organized under the laws of Bermuda.

10.    Defendant HL is a limited liability company organized under the laws of the State of Delaware.  HL is an indirect subsidiary of Enel SpA, a global energy conglomerate with a reported market capitalization in excess of $65 billion.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to sections 1332 and 1441 of title 28 of the United States Code.

12.    Venue is proper in this Court pursuant to section 1441(a) of title 28 of the United States Code.

## FACTUAL ALLEGATIONS

**HL Builds a Wind Farm Project to Supply Electricity to the
Texas Interconnection, Where Wholesale Market Prices Are Set by ERCOT**

13.    Texas is one of the largest electricity markets in the United States and the only one of the contiguous 48 states with its own standalone electricity grid.  That grid, known as the **Texas Interconnection**, covers 213 of the 254 counties in Texas and is one of the three main electrical grids in the United States.  The Texas Interconnection is known as an "electrical island" because, with certain limited exceptions, it is not connected to the other two U.S. grids. This means that when Texas' own electricity resources fall short, it has nowhere else to go to get electricity.

14.    ERCOT manages the Texas Interconnection.  ERCOT and its operations are overseen by the Public Utility Commission of Texas (**"PUCT"**), which also enforces

4

compliance with Texas' utility laws and regulations and regulates electric utility rates in the state. The PUCT is ultimately responsible for ERCOT's operations.

15. ERCOT maintains the reliable operation of the Texas Interconnection by matching electricity supply with demand, and publishing wholesale electricity prices intended to ensure electricity is reliably available and delivered to market participants. Texas law, specifically 16 T.A.C. § 25.505(g)(6)(B), sets a "high system-wide offer cap" (**"HCAP"**) on wholesale electricity prices. During the relevant period, the HCAP was $9,000 per megawatt hour (**"MWh"**). Subject to the HCAP, the wholesale prices published by ERCOT are supposed to reflect the scarcity (if any) of the electricity supply. In essence, as demand increases and approaches supply limits, wholesale prices are meant to rise to reflect the increasing scarcity, and are capped at a maximum of $9,000/MWh.

16. Defendant HL is the owner of a wind farm project (the **"Project"**) located in Upton and Crockett Counties in West Texas that generates electricity which HL sells into the Texas Interconnection. Construction of the Project began in January 2019, and operations began in December 2019 with 450 MW of capacity. In May 2020, an additional 50 MW came online, bringing the Project's total operating capacity to 500.085 MW.

17. In building the Project, HL understood that the wholesale market for the electricity it produced would be set by ERCOT, and HL has sold all of the electricity generated by the Project at the wholesale market prices set by ERCOT.

18. HL was solely responsible for choosing the equipment for the Project, and for ensuring it was suitable for its intended purpose, including protecting against conditions such as low temperatures and ice. Indeed, after a significant 2011 winter storm, the Federal Energy Regulatory Commission (**"FERC"**) identified low temperatures and icing as potential

4857-5858-0701.1

operational risks for wind farms in Texas, and recommended that wind farms take steps, particularly during design and construction, to anticipate and address such conditions.  Eight years later, however, HL chose to use turbines it has admitted were "unlike other types of turbines available in the market" and were incapable of being modified to address the low temperature and ice conditions that materialized during Winter Storm Uri.  In other words, HL failed to heed FERC's warnings, and instead installed turbines unprepared for the low temperature and ice conditions that were known to occur in Texas.

**HL Enters Into a Proxy Revenue Swap With ART as a**
**<u>Hedge Against Low Market Prices and Insufficient Wind</u>**

19.    As the operator of the Project, HL was responsible for the design, construction, maintenance, and operation of the wind farm.  It bore the risk that the turbines at the Project would not operate for any reason.  Indeed, for much of the relevant period, over half of the turbines were offline.

20.    HL, however, could not control the wholesale electricity prices set by ERCOT or the wind the Project would use to generate electricity.  To address the risks the Project faced on account of volatility in prices and wind, before the start of construction HL entered into a proxy revenue swap transaction with ART (the **"Proxy Revenue Swap"** or **"PRS"**) as a hedge against low prices and insufficient wind.  As detailed below, the PRS provided that ART would make certain payments to HL if wholesale electricity prices and wind speeds were sufficiently low, and HL would make payments to ART if wholesale electricity prices and wind speeds were sufficiently high.  Put simply, ART took the risk that wholesale electricity prices and wind speeds would be low, and HL took the risk that wholesale electricity prices and wind speeds would be high.  The PRS does not allocate any risks other than volatility in prices and wind speeds.

6

21.    To document the Proxy Revenue Swap, the parties executed a series of documents, all dated as of October 10, 2018:  (i) a standard-form 2002 International Swaps and Derivatives Association (**"ISDA"**) Master Agreement (the "**Master Agreement**") together with a Schedule to the Master Agreement, (ii) a standard-form 1994 ISDA Credit Support Annex (the **"CSA"**) together with a Paragraph 13 to the CSA, and (iii) a Confirmation.  As of December 13, 2019, the parties executed an Amended and Restated Schedule to the Master Agreement (the **"Amended Schedule"**), an Amended and Restated Paragraph 13 to the CSA (the **"Amended Paragraph 13"**), and an Amended and Restated Confirmation (the **"Amended Confirmation"**). The Amended Confirmation incorporated by reference the 2006 ISDA Definitions and the 2005 ISDA Commodity Derivatives Definitions (collectively, the **"Definitions"**).  Copies of the Master Agreement, Amended Schedule, CSA, Amended Paragraph 13, Amended Confirmation and Definitions are attached hereto as Exhibits A-G, respectively, and are referred to herein collectively as the **"PRS Agreement."**

22.    The Amended Confirmation sets forth the payments to be made by the parties.  Pursuant to Section 4 of the Amended Confirmation, HL paid ART a One-Time Premium of $5.9 million on October 10, 2018.  Pursuant to Section 3, HL also paid ART an **Annual Premium** of $619,000 on July 1, 2020, and agreed to make additional Annual Premium payments to ART every July 1 through 2030.

23.    In addition to these premium payments, pursuant to Section 9 of the Amended Confirmation, either HL or ART is required to pay a Cash Settlement Amount for each quarterly **Settlement Period**, beginning with the quarter starting July 1, 2020, through the quarter ending June 30, 2030.  As described below, the Cash Settlement Amount reflects the allocation of risk between the parties with respect to market prices and wind speed.  When

7

market prices and wind speeds are low, ART makes a payment to HL; and when market prices and wind speeds are high, HL makes a payment to ART.

24.     The **Cash Settlement Amount** is the difference between the **Fixed Payment** amount of $5,177,000, and a **Floating Payment** amount equal to the Proxy Revenue for the relevant Settlement Period.

25.     The **Proxy Revenue** is the dollar value of the Project's Proxy Generation, which is simply the Market Price (subject to a Market Price Floor not relevant here) multiplied by the Proxy Generation.

26.     The Market Price is determined by ERCOT. Specifically, the Amended Confirmation defines **"Market Price"** to mean, "for each hour during the Settlement Period, the arithmetic average of the Real-Time Settlement Point Price (as defined in the ERCOT Integrated Market Protocols[)] at the Settlement Point as determined by the ISO/RTO." The "Real-Time Settlement Point Price" is one of the wholesale electricity prices determined by ERCOT, and its components are set forth in the ERCOT Integrated Market Protocols. The Amended Confirmation defines the **"ERCOT Integrated Market Protocols"** to mean, "the documents adopted by ERCOT, including any attachments or exhibits referenced in the documents, as amended from time to time, containing the scheduling, operating, planning, reliability, and settlement policies, rules, guidelines, procedures, standards and criteria of ERCOT." As discussed below, the ERCOT Integrated Market Protocols include the ERCOT Nodal Protocols and certain Market Notices issued by ERCOT. The Amended Confirmation defines the **"Settlement Point"** to mean the ERCOT South Hub, one of the locations in the Texas Interconnection for which ERCOT determines wholesale electricity prices. Finally, the

8

4857-5858-0701.1

Amended Confirmation defines the "ISO/RTO," or independent system operator or regional transmission organization, to mean ERCOT.

27. The Amended Confirmation defines **"Proxy Generation"** as "the amount of energy, in MWh, the Project *would have generated* had the Project achieved its Expected Operational Efficiency" (emphasis added) in accordance with a formula set forth in the Amended Confirmation. The contract sets the Expected Operation Efficiency and all the variables in the formula save one—the actual horizontal wind speed reported at the location of each of the 164 wind turbines comprising the Project. Thus, Proxy Generation is a hypothetical measure of the Project's potential generation, not an actual measure of its actual generation, based on recorded wind speeds. Proxy Revenue, in turn, does not purport to measure the Project's actual revenue (or lack thereof).

28. Which party to the PRS pays the Cash Settlement Amount for any given Settlement Period depends upon the Market Price and the measured wind speed. If the Market Price and wind speed (and thus Proxy Generation) are low enough such that the Floating Payment/Proxy Revenue is less than the amount of the Fixed Payment, ART pays the difference to HL as the Cash Settlement Amount. If the Market Price and wind speed (and thus Proxy Generation) are high enough such that the Floating Payment/Proxy Revenue is greater than the amount of the Fixed Payment, HL pays the excess to ART as the Cash Settlement Amount.

29. The calculation of the Cash Settlement Amount does not take into account the actual amount of electricity the Project generates or sells or its actual revenue. Even if the Project's wind turbines are not operational (for any reason), unless there is literally no wind blowing at the Project location, there will be a positive value for Proxy Generation based upon the measured wind speed, and thus a value for Proxy Revenue. Accordingly, even if the Project

4857-5858-0701.1

is not generating or selling electricity, and thus not generating actual revenue, the PRS Agreement provides that Proxy Revenue will be determined. ART thus may be obligated to pay a Cash Settlement Amount to HL if the Market Price and the wind speed are low enough, and HL may be obligated to pay a Cash Settlement Amount to ART if the Market Price and wind speed are high enough.

30.    As noted above, HL was solely responsible for the design, construction, maintenance and operation of the Project equipment. Under the Proxy Revenue Swap, ART did not assume any responsibility for the Project's inability to operate for any reason; HL alone bore those risks. Indeed, prior to Winter Storm Uri, HL paid Cash Settlement Amounts to ART based upon Proxy Generation and Proxy Revenue attributable to 84 turbines (roughly half the Project) that had been offline and not producing electricity since March 2020.

31.    Pursuant to the Amended Confirmation, the **Calculation Agent** is responsible for calculating the Cash Settlement Amount. HL and ART entered into a Calculation Services Agreement with REsurety, Inc. ("**REsurety**"), also dated October 10, 2018, pursuant to which REsurety was appointed as the Calculation Agent for the Proxy Revenue Swap. A copy of the Calculation Services Agreement is attached hereto as Exhibit H. REsurety is an independent third-party provider unaffiliated with either ART or HL.

32.    Under the Calculation Services Agreement, after the end of each of the first two months of each quarterly Settlement Period, REsurety is required to provide a non-binding **"Interim Report"** which includes an interim calculated Floating Payment amount for the relevant month. After the end of each Settlement Period, REsurety is required to provide a hedge settlement report (the **"Settlement Report"**), which includes the Cash Settlement Amount for that Settlement Period. The Cash Settlement Amount is due and payable pursuant to the

10

information in the Settlement Report on or before the **Settlement Payment Date**, which is defined as the fifth local business day following receipt of the relevant Settlement Report.

33.    Pursuant to Paragraph 13 of the CSA, on October 19, 2018, HL posted as Credit Support an irrevocable standby letter of credit for the benefit of ART, initially in the amount of $51,625,000.00.

**The Section 10 Dispute Resolution Process**

34.    Section 10 of the Amended Confirmation, titled "Dispute Resolution," applies "[i]f any action, calculation or other determination of the Calculation Agent is disputed in good faith by either Party (the 'Disputing Party')."

35.    No later than 30 days after delivery of the relevant Settlement Report, a Disputing Party is required to deliver a **Dispute Notice** to the Calculation Agent and the other party specifying its objection, proposed calculation or resolution, and a statement of the amount not in dispute.  Section 10 requires any undisputed amount to be paid when due, regardless of whether a dispute is pending.

36.    Once a party delivers a Dispute Notice, a series of specific steps governs the parties' conduct in resolving the dispute:

(a)    Within 10 business days of delivery of a Dispute Notice, the parties and REsurety are to consult in an attempt to resolve the dispute.

(b)    If there is no resolution, the parties then have 10 business days to agree upon "a wind resource assessment or independent engineering consultant that is recognized as having expertise in the U.S. wind energy industry," referred to as the **"Independent Consultant,"** to resolve the dispute.

(c)    If the parties cannot agree on an Independent Consultant, each party has 10 business days to select its own Independent Consultant, and the parties'

11

4857-5858-0701.1

Independent Consultants then have 10 business days to select a different Independent Consultant to resolve the dispute.

(d)     If the parties' Independent Consultants cannot agree upon a different Independent Consultant, then the parties "shall engage [the] American Arbitration Association solely for the purpose of selecting such third Independent Consultant in accordance with the requirements of this Section 10 and the Commercial Arbitration Rules and Mediation Procedures."  Section 10 does not set a deadline for the parties to engage the AAA.

37.     Once selected, the Independent Consultant is supposed to render a decision within 30 days.  In the event that the Independent Consultant does not render a decision within 90 days of the delivery of the Dispute Notice, the Disputing Party must pay the other party the disputed portion of the Cash Settlement Amount within three Local Business Days, subject to reconciliation, refund or adjustment upon the determination by the Independent Consultant.

38.     Both parties are entitled to make submissions to the Independent Consultant, and each party may request that the Independent Consultant place restrictions on sharing of proprietary information with the other party.

39.     Section 10 states that the procedure set forth therein is "the exclusive procedure for resolving any dispute related to the actions, calculations and determinations of the Calculation Agent under [the] Confirmation," and that the decision of the Independent Consultant shall be conclusive and binding on, and enforceable against, the parties in any court of competent jurisdiction.

4857-5858-0701.1

**The Project's Turbines Are Unprepared for Winter Storm Uri**

40.    Winter Storm Uri began on approximately February 11, 2021.  As temperatures dropped, electricity demand rose while (for a variety of reasons) supply went offline and remained so for multiple days.  On February 12, 2021, Texas Governor Greg Abbott issued a Declaration of a State of Disaster for all counties in Texas.

41.    On February 15, 2021, ERCOT declared its highest state of emergency, an Emergency Energy Alert Level 3 (EEA3), due to exceptionally high electricity demand exceeding supply.  To maintain the stability of the electrical grid, ERCOT directed transmission operators in the ERCOT region to curtail or "shed" more than 10,000 MWh of "firm load" (i.e., reduce demand for and use of electricity).  At that point, the ERCOT system was expected to remain in EEA3, and firm load shed was expected to continue, for a sustained period of time in light of the expected duration of Winter Storm Uri.  Due to the artificial reduction in demand on account of the firm load shed, electricity prices in the ERCOT system were artificially depressed at less than $9,000/MWh cap set by 16 TAC § 25.505(g)(6)(B).

42.    Texas Utilities Code § 39.151(d) gives the PUCT "complete authority" over ERCOT, and 16 TAC § 25.501(a) provides that ERCOT determines market clearing prices of energy and other ancillary services in the ERCOT market unless "otherwise directed by the commission."  In an order dated February 15, 2021 (the **"PUCT Order,"** a copy of which is attached hereto as Exhibit I), the PUCT declared that the artificial reduction in prices due to firm load shed "is inconsistent with the fundamental design of the ERCOT market.  Energy prices should reflect scarcity of the supply.  If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest [i.e., at the HCAP of $9,000/MWh]."  The PUCT therefore determined "that adjustments are needed to ERCOT prices to ensure they accurately reflect the scarcity conditions in the market."

Accordingly, the PUCT Order directed ERCOT "to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals."

43.     That same day, ERCOT issued a Market Notice (the **"ERCOT Notice,"** a copy of which is attached hereto as Exhibit J) explaining how it intended to comply with the PUCT Order.  Pursuant to the ERCOT Nodal Protocols, the Real-Time Settlement Point Price includes a "Real-Time Reliability Deployment Price Adder."  In the ERCOT Notice, ERCOT announced that, in order to implement the pricing outcomes directed by the PUCT Order, ERCOT would be making an administrative adjustment to one of the values used to determine the Real-Time Reliability Deployment Price Adder, boosting the Real-Time Settlement Point Price as high as the HCAP of $9,000/MWh.  ERCOT continued to make the administrative adjustment called for by the PUCT Order and the ERCOT Notice until February 19.

44.     During the seven-day period from February 13 to 19, 2021, electricity suppliers in Texas sold more than $50 billion worth of electricity at the ERCOT-determined prices, including the prices set pursuant to the PUCT Order and the ERCOT Notice.

45.     As noted above, HL had not heeded FERC's advice, and had installed turbines at the Project that were unprepared for the conditions that materialized during Winter Storm Uri.  According to HL, ice conditions and low temperatures shut down or compromised the 80 turbines at the Project that were online when the storm began.  (The remaining 84 turbines at the Project already were offline due to other issues.)  The Project, however, continued to produce electricity, which HL sold at the wholesale prices determined by ERCOT.  Upon information and belief, HL earned revenues of approximately $16 million from electricity sold at wholesale prices determined by ERCOT pursuant to the PUCT Order and the ERCOT Notice.

14

46.    Meanwhile, regardless of whether the Project's turbines were operational, Proxy Revenue continued to accrue under the terms of the Proxy Revenue Swap because the swap is not based on actual generation or revenues.  On March 22, 2021, REsurety delivered the nonbinding Interim Report for the month of February 2021, which reflected the PUCT-ordered increase in Market Prices during Winter Storm Uri.  The Interim Report indicated that the Proxy Revenue for February 2021 was $125,023,165.  REsurety later adjusted this figure in the final Settlement Report for Q1 2021, delivered April 23, to $131,821,314.  REsurety determined that total Proxy Revenue for Q1 2021 was $135,010,815, and HL thus owed ART a Cash Settlement Amount of $129,833,815.

**HL Baselessly Challenges REsurety's Calculations and Refuses to Pay the Full Q1 2021 Cash Settlement Amount**

47.    On April 21, 2021, before REsurety delivered the Q1 2021 Settlement Report, HL served ART with a 333-page Dispute Notice pursuant to Section 10 (the **"HL Dispute Notice"**) challenging the March 22 Interim Report.  (A copy of the HL Dispute Notice is attached hereto as Exhibit K.)  On April 28, after REsurety delivered the final Q1 2021 Settlement Report, HL paid ART $4,632,685, which HL asserted was the undisputed portion of the Q1 2021 Cash Settlement Amount.  HL refused, and continues to refuse, to pay the balance of the Q1 2021 Cash Settlement Amount, $125,201,130 (the **"Disputed Q1 2021 Cash Settlement Amount"**).

48.    On May 6, ART responded to the HL Dispute Notice, rejecting its arguments and demanding payment of the Disputed Q1 2021 Cash Settlement Amount together with interest (the **"ART Response"**).  (A copy of the ART Response is attached hereto as Exhibit L.)

49.    The HL Dispute Notice rests on two premises, neither of which is correct.

15

4857-5858-0701.1

50.     First, HL asserted that it was the parties' intention that ART would bear what HL calls "all weather-related" operational risk.  According to HL, the Cash Settlement Amount therefore should be based not on Proxy Generation as set forth in the Amended Confirmation, but rather on an "adjusted" Proxy Generation figure that takes into account "Expected Generation"—a new term made up by HL and found nowhere in the PRS Agreement—and the Project's actual (lack of) generation and compromised operations during Winter Storm Uri.

51.     Contrary to HL's contention, the parties did not in fact agree that ART would bear "all weather-related" risk.  In particular, the PRS Agreement is clear and unambiguous that the Cash Settlement Amount payable each quarter is to be calculated based on hypothetical Proxy Generation, not actual generation.

52.     Second, HL asserted that REsurety did not use the Market Price to calculate the Cash Settlement Amount.  As noted above, the Amended Confirmation defines the Market Price as the "the arithmetic average of the Real-Time Settlement Point Price (as defined in the ERCOT Integrated Market Protocols[)] at the Settlement Point as determined by [ERCOT]."  In accordance with the Amended Confirmation, REsurety used the Real-Time Settlement Point Price at the Settlement Point as determined by ERCOT.

53.     HL asserted, however, that ERCOT did not follow the ERCOT Integrated Market Protocols in determining the Real-Time Settlement Point Price, so the Market Price was unavailable and should have been determined by REsurety.  The parties never intended that the Calculation Agent would determine the Market Price, only that it would accept the price determined by ERCOT.  The Confirmation does not endow the Calculation Agent with the authority to second-guess ERCOT's determination of Market Prices.  Indeed, it would be absurd

16

to expect that the Calculation Agent (or an Independent Consultant reviewing the decision of the Calculation Agent) would review and substitute its judgment as to whether ERCOT complied with its own protocols, which span thousands of pages.

54. In all events, ERCOT did follow the ERCOT Integrated Market Protocols. HL contends that ERCOT should have determined the Real-Time Settlement Point Price based on the ERCOT Nodal Protocols, and should have ignored the PUCT Order and its own ERCOT Notice. Yet under the ERCOT Nodal Protocols, ERCOT was obligated to follow the PUCT Order and the ERCOT Notice. Moreover, under the Amended Confirmation, the ERCOT Notice was a part of the ERCOT Integrated Market Protocols because it was a document adopted by ERCOT containing, *inter alia*, operating, planning and reliability policies, rules, guidelines, procedures, standards and criteria of ERCOT. As such, ERCOT's determination of the Real-Time Settlement Point Price based upon the ERCOT Notice was in accord with the Amended Confirmation.

55. In a Memorandum Opinion & Order dated March 19, 2024, the Court held that matters "related to the actions, calculations, and determinations of the Calculation Agent in calculating the Q1 2021 Cash Settlement Amount" should be resolved pursuant to the Section 10 dispute resolution process.

**The Parties Begin the Section 10 Dispute Resolution Process**

56. Under Section 10 of the Amended Confirmation, the parties and the Calculation Agent have 10 business days after delivery of a Dispute Notice to consult with each other and the Calculation Agent in an attempt to resolve the dispute in good faith. Since the HL Dispute Notice was delivered on April 21, 2021 the parties and REsurety had until the close of business on May 5 to consult. HL did not meet its obligations with respect to this step of the

17

4857-5858-0701.1

dispute resolution process.  Despite REsurety's repeated efforts to reach out to HL before the

May 5 deadline, HL did not speak to REsurety about the HL Dispute Notice until May 17.

57.    The next step in the dispute resolution process was the selection of an

Independent Consultant.  Notwithstanding ART's reservations that an Independent Consultant—

a wind resource assessment or independent engineering consultant—was not the appropriate

person to address the essentially legal challenges raised by HL, ART proceeded in good faith

with the next steps in the dispute resolution process.

58.    The parties had ten business days (i.e., until the close of business on May

19) to agree upon an Independent Consultant.  On May 17, HL proposed Eric Soderlund of

Sargent & Lundy and Steven C. Block of Black & Veatch.  On May 19, ART proposed Dr.

Samuel Newell and Dr. Kathleen Spees, both of the Brattle Group.  Both of ART's proposed

candidates satisfied the requirements for an Independent Consultant under Section 10.  The

parties were unable to agree upon an Independent Consultant from these proposed candidates.

59.    On May 31, the Parties entered into a Standstill Agreement, in which they

agreed that May 31, not May 19, was the last day for the Parties to agree upon an Independent

Consultant.  They also agreed that on the first business day after the expiration of the Standstill

Agreement—June 15—ART and HL would be deemed to have selected Spees and Soderlund as

their respective Independent Consultants, who then would have 10 business days to agree upon a

different Independent Consultant to resolve the dispute.

60.    Spees and Soderlund were not able to agree.  As a result, the parties were

supposed to engage the AAA to select a different Independent Consultant.  On July 1, HL sent

ART a draft form to be submitted to the AAA.  HL's draft contained inaccuracies, omitted key

players from the potential conflict disclosures, and failed to include sufficient details about the

18

nature and scope of the dispute.  For example, HL's form used a single word—"contract"—to describe the dispute, obscuring the complexity and nature of the dispute and potentially leaving the AAA without helpful information necessary to identify suitable candidates from among the pool of persons with the contractually required qualifications to serve as the Independent Consultant.

**HL Improperly Purports to Terminate the Proxy Revenue Swap and**
**Refuses to Complete the Section 10 Dispute Resolution Process**

61.    No form was ever submitted to the AAA, and no Independent Consultant was ever selected, because HL stopped participating in the Section 10 dispute resolution process. Rather than continue with the selection of an Independent Consultant, HL purported to terminate the Proxy Revenue Swap based upon what it alleged was a breach by ART.  HL's allegations are baseless, and its purported termination therefore is not valid under the terms of the PRS.

62.    On June 15, ART declared an Event of Default and drew upon the letter of credit posted by HL based upon HL's failure to pay the Disputed Q1 2021 Cash Settlement Amount.

63.    By letter dated June 17, HL purported to give notice of a Potential Event of Default by ART (the **"HL Notice of Potential Default"**).  HL asserted that because it had invoked the Section 10 dispute resolution process, and 90 days had not yet elapsed since it did so, it was not yet obligated to pay the Disputed Q1 2021 Settlement Amount.

64.    The HL Notice of Potential Default asserted that a Potential Event of Default had occurred because ART had declared a "false" Event of Default and drawn on the letter of credit.  HL demanded that ART withdraw its declaration of Event of Default and return the letter of credit proceeds.  The HL Notice of Potential Default did not assert that ART owed, nor did it demand, that ART pay, interest on the returned proceeds.

65.     The HL Notice of Potential Default also summarily asserted that ART had failed to comply with the Section 10 dispute resolution process and demanded that ART do so. The HL Notice of Potential Default did not specify how ART had failed to comply with Section 10 or suggest how ART could cure any such alleged failure.

66.     ART addressed HL's stated complaints within the applicable cure period. Pursuant to a letter dated July 15, ART returned the full amount of the letter of credit proceeds, and by letter dated July 17, ART withdrew its June 15 declaration of an Event of Default and re-affirmed its willingness to continue with the Section 10 dispute resolution process.  At the same time, ART reserved the right to submit information relevant to the dispute to both the AAA and the Independent Consultant.

67.     Notwithstanding the steps taken by ART, by letter dated July 19, HL purported to notify ART that Events of Default had occurred and were continuing (the **"HL Notice of Default"**).

A.     **HL Could Not Terminate Pursuant to Section 5(a)(ii)(1) of the Master Agreement Because It Did Not Provide the <u>Required Notice and Opportunity to Cure</u>**

68.     HL purported to terminate under Section 5(a)(ii)(1) of the Master Agreement.  That provision, however, requires HL to provide ART with advance notice and 30 days to cure.  HL did neither.

69.     The HL Notice of Potential Default complained that ART had improperly declared an Event of Default and drawn down on the letter of credit posted by HL, and summarily asserted that ART had "fail[ed] to comply with the Section 10 dispute resolution process."  The June 17 notice did not specify how ART had failed to comply with the Section 10 process, but fairly read, it appears to assert that ART failed to comply with Section 10 by declaring an Event of Default and drawing down on the letter of credit.  The June 17 notice

4857-5858-0701.1

failed to specify what ART had to do to comply with Section 10 other than withdrawing the Event of Default and returning the letter of credit proceeds, both of which ART did within the 30-day cure period.

70.     When HL declared an Event of Default and purported to terminate on July 19, it asserted—for the first time—that ART failed to comply with Section 10 because it:  (1) did not sign the AAA form HL had prepared; (2) supposedly refused to have the dispute resolved by an Independent Consultant with the qualifications set forth in Section 10; and (3) insisted upon conditions supposedly inconsistent with Section 10 by reserving the right to submit relevant information to the AAA and make its own submission to the Independent Consultant.  HL also asserted ART had failed to pay an unspecified amount of interest on the letter of credit proceeds it had returned.

71.     Leaving aside for the moment the merits of HL's assertions (which are addressed further below), it is readily apparent that HL did not provide ART the required notice and opportunity to cure its supposed Events of Default.  None of them had even occurred as of the June 17 HL Notice of Potential Defaults—each of the alleged Events of Default occurred long after the June 17 letter:  HL first gave ART the draft AAA form on July 1; ART's supposed objection to the Independent Consultant's qualifications occurred on July 8; ART first reserved the right to make its submissions to the AAA and the Independent Consultant on July 17; and HL did not assert that interest was owed on the letter of credit proceeds until July 19.  Because HL did not give ART notice and an opportunity to cure of any of these purported Events of Default, HL cannot terminate under Section 5(a)(ii)(1).

72.     And even if, contrary to fact, the June 17 HL Notice of Potential Default could somehow be construed to cover the later alleged Events of Default, HL purported to

4857-5858-0701.1

terminate before the expiration of the 30-day cure period.  Thirty days from June 17, 2021, was

July 17, which was a Saturday.  In these circumstances, New York law extended the cure period

until the next business day—Monday, July 19.  N.Y. Gen. Constr. Law § 25, subd. 1.  Thus, the

earliest HL could have terminated was on July 20.  Instead, HL purported to do so on July 19,

before the cure period had expired.  For that reason alone, HL's purported termination pursuant

to Section 5(a)(ii)(1) was invalid.

### B. HL Could Not Terminate Pursuant to Section 5(a)(ii)(2) of the Master Agreement Because ART Complied with Section 10 of the Confirmation

73.    HL also purported to terminate pursuant to Section 5(a)(ii)(2) of the

Master Agreement because ART supposedly repudiated the Section 10 process.  ART was

prepared to proceed with the Section 10 process, and HL's arguments to the contrary are nothing

more than bare attempts to create disputes that do not exist or impose restrictions on ART found

nowhere in Section 10.

### 1. ART Affirmed Its Willingness to Abide by the Independent Consultant Qualifications Set Forth in Section 10

74.    Section 10 of the Amended Confirmation provides that the Independent

Consultant must be "a wind resource assessment or independent engineering consultant that is

recognized as having expertise in the U.S."  HL contends that ART was unwilling to proceed

with an Independent Consultant selected based solely on those qualifications.  While ART had

indeed raised concerns about whether those qualifications were sufficient to resolve an

essentially legal dispute, it ultimately and undisputedly agreed to abide by Section 10.  On July

17, ART made clear that it was prepared to proceed with the selection of an Independent

Consultant that met the requirements of Section 10.  Because ART had affirmed its willingness

to abide by Section 10 before HL purported to terminate on July 19, HL's purported termination

was invalid.

4857-5858-0701.1

### 2. ART Was Entitled to Reserve Its Right to Make Submissions to the AAA and the Independent Consultant

75.    At the same time that ART affirmed its willingness to abide by Section 10, it also reserved its right to make submissions to the AAA or the Independent Consultant.  HL claims that in doing so, ART repudiated Section 10 by "making clear its intent to participate in the contractual dispute resolution process only upon terms that are inconsistent with Section 10." Not so.

76.    Reserving rights is not the same as insisting upon terms and repudiating Section 10.  The rights reserved may never be exercised.  And if ART attempts to exercise those rights, it will be up to the Independent Consultant to decide whether such exercise was proper, just as it might resolve other arguments raised by the parties.  Repudiation occurs only when a party refuses to proceed unless its demands are met.  ART has done nothing of the sort here; to the contrary, it has been attempting to move forward resolution of HL's dispute—at this point, for more than three years.  Moreover ART's reservation of rights was entirely reasonable and consistent with both the Amended Confirmation and fundamental notions of due process.

### (a) ART Was Entitled to Reserve the Right to Submit Relevant Information to the AAA

77.    Section 10 provides that if the Independent Consultant candidates selected by the parties cannot agree upon a third Independent Consultant, the parties "shall engage [the] American Arbitration Association solely for the purpose of selecting such third Independent Consultant in accordance with the requirements of this Section 10 and the Commercial Arbitration Rules and Mediation Procedures."  As discussed above, the parties' respective candidates were not able to agree on a third Independent Consultant.

78.    HL sent ART a draft form it proposed to submit to the AAA, on behalf of both parties, to initiate the process for selecting the Independent Consultant.  However, the draft

4857-5858-0701.1

was deficient in several respects, the most significant being that it described the "Nature of Dispute" with a single word:  "contract."  It was this description—which obscured the dispute's complexity and subject matter—that prompted ART to reserve its right to submit additional information to the AAA.

79.   Nothing in the Amended Confirmation prohibits ART from doing that. Neither Section 10 nor the AAA rules say that every AAA submission must be made jointly, or that one party cannot provide information to the AAA by itself.  Indeed, the AAA's Commercial Arbitration Rules and Mediation Procedures, which Section 10 specifically incorporates, anticipate that the AAA will appoint an arbitrator after receiving submissions from each party. Thus, ART was entitled to reserve the right to submit relevant information to the AAA.

**(b)      ART Was Entitled to Reserve the Right to Make
<u>Its Own Submission to the Independent Consultant</u>**

80.   HL has asserted that Section 10 requires that the Independent Consultant "must" make his or her determination "without any additional or supplemental materials by either party."  Section 10 actually provides that the Independent Consultant, "without any additional or supplemental submittals by either Party, *may* consider legal and industry matters as in its opinion are necessary or appropriate to make a proper determination."  The Independent Consultant "*may*" make its decision without additional submissions, not "*must*."  Nothing in Section 10 precludes the Independent Consultant from receiving additional submissions, and the fact that this provision permits the Independent Consultant to proceed in certain circumstances without additional submissions presumes that there otherwise could be such submissions.

81.   Elsewhere, Section 10 expressly contemplates both parties making submissions:  "Information provided to the Independent Consultant shall be subject to reasonable confidentiality requirements as requested by Party A [ART], Party B [HL] or the Calculation

4857-5858-0701.1

Agent, which may include restrictions on the sharing of certain proprietary information with Party A, Party B or the Calculation Agent."  In other words, either party can request confidentiality restrictions when making a submission.  There would be no reason to allow ART to request confidential treatment if only HL were to be making a submission.  If only the Disputing Party were to be making a submission, then this provision would have said so.

82.     Indeed, the notion that only the Disputing Party may make a submission is antithetical to the structure of the Section 10 process, which requires the participation of both parties throughout:  both parties are to have consultations with the Calculation Agent to resolve the dispute, appoint Independent Consultant candidates, and engage the AAA to select a third Independent Consultant.  It makes no sense that, after such joint participation in the process leading up to the appointment of an Independent Consultant, the resolution of the dispute between the parties would be based solely on the views advanced by only one party, the Disputing Party.

### C.      ART Timely Paid Any Interest Due

83.     Even though the HL Notice of Potential Default had said nothing about interest, ART had paid HL an amount sufficient to cover any such interest on the letter-of-credit proceeds within the cure period after receiving the HL Notice of Default on July 21.  By letter dated July 26, HL asserted for the first time that interest should have been paid at the **"Default Rate,"** which the Master Agreement defines as "a rate per annum equal to the cost (without proof of evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum."  Thus, the Default Rate requires that HL certify its funding costs to ART.  HL has never provided this information or otherwise stated the amount of allegedly additional interest it claims to be due.

* * * * *

25

4857-5858-0701.1

84.     Notwithstanding the improper bases for the HL Notice of Default, HL designated July 19 as the Early Termination Date for the Proxy Revenue Swap, and claimed that it owed no further amounts to ART—including the Disputed Q1 2021 Cash Settlement Amount. HL also refused to participate further in the Section 10 dispute resolution process.

**ART Terminates the Proxy Revenue Swap**

85.     HL breached the PRS Agreement in at least three ways, each of which constitutes an Event of Default.  With respect to each, ART declared an Event of Default and designated an Early Termination Date of August 14, 2021.

86.     First, HL failed to post required Credit Support.  On July 21, ART demanded that HL post Credit Support in the form of a letter of credit in the amount of $29,500,000.  (The amount of the required letter of credit had decreased from the original amount because the Project subsequently had met a contractually specified operational threshold.)  HL refused to do so, based on its contention that it had previously terminated the Proxy Revenue Swap as of July 19.  On July 23, ART notified HL that its failure to post the required Credit Support would constitute an Event of Default if not remedied within two Local Business Days, i.e., by July 27.  HL did not post the letter of credit, and on July 29, ART notified HL that an Event of Default had occurred as a result of, *inter alia*, that failure, and ART designated August 14 as the Early Termination Date.

87.     Second, HL failed to pay the Cash Settlement Amount for Q2 2021, which had come due in the interim.  REsurety delivered the Settlement Report for Q2 2021, dated July 14, 2021, which indicated a Cash Settlement Amount of $2,978,326 due from HL to ART (the **"Q2 2021 Cash Settlement Amount"**).  On August 3, ART notified HL that its failure to pay the Q2 2021 Cash Settlement Amount by August 6, would constitute an Event of Default. Again, HL refused to comply with its contractual obligations based on its contention that HL had

26

previously terminated the Proxy Revenue Swap as of July 19.  On August 6, ART notified HL that its failure to pay the Q2 2021 Cash Settlement Amount had ripened into an Event of Default and again designated August 14 as the Early Termination Date.

88.     Lastly, HL failed to pay the Disputed Q1 2021 Cash Settlement Amount. On August 5, ART notified HL that the 90-day period for the Independent Consultant to render a decision under Section 10 had expired on August 4, such that HL was obligated to pay the Disputed Q1 2021 Cash Settlement Amount, and that HL's failure to do so would constitute a Potential Event of Default if not remedied within three Local Business Days, i.e., by August 9. On August 10, ART notified HL that its failure to pay the Disputed Q1 2021 Cash Settlement Amount by August 13 would constitute an Event of Default.  HL did not make that payment, and on August 13, ART notified HL that its failure to pay had ripened into an Event of Default and designated August 14 as the Early Termination Date.

89.     Under the terms of the PRS Agreement, HL owes ART an Early Termination Amount.  The **Early Termination Amount** is the sum of the Unpaid Amounts and the Close-out Amount.  The **Unpaid Amounts** owed by HL are the Disputed Q1 2021 Cash Settlement Amount and the Q2 2021 Cash Settlement Amount, totaling $128,179,456.  The **Close-out Amount** represents the net costs to ART of replacing the Proxy Revenue Swap, including payments that would have been received after the Early Termination Date.  Using the methodology set forth in the Master Agreement, ART determined that the Close-out Amount is $75,142,350, for a total Early Termination Amount of $203,321,806.

90.     On August 30, 2021, ART notified HL that the Early Termination Amount was immediately due and payable along with Default Interest as well as ART's out-of-pocket expenses, including legal fees.  HL has not paid any of these amounts.

## CLAIMS FOR RELIEF

### COUNT I – DECLARATORY JUDGMENT

91.     ART re-alleges and incorporates by reference all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

92.     The PRS Agreement constitutes a valid and binding contract between ART and HL.

93.     HL designated an Event of Default and Early Termination Date for the Proxy Revenue Swap.

94.     ART contends that HL's designation of an Event of Default and Early Termination Date were improper and without legal or factual basis.

95.     An actual and justiciable controversy exists between ART and HL as to the validity of HL's designation of an Event of Default and Early Termination Date.

96.     The Court should declare that HL's purported designation of an Event of Default and Early Termination Date is invalid and of no force and effect.

### COUNT II – DECLARATORY JUDGMENT

97.     ART re-alleges and incorporates by reference all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

98.     The PRS Agreement constitutes a valid and binding contract between ART and HL.

99.     ART designated Events of Default and an Early Termination Date for the Proxy Revenue Swap.

100.     HL disputes the validity of ART's designations of Events of Default and an Early Termination Date.

4857-5858-0701.1

101.    An actual and justiciable controversy exists between ART and HL as to the validity of ART's designations of Events of Default and an Early Termination Date.

102.    The Court should declare that ART's designations of Events of Default and an Early Termination Date are valid and enforceable.

## COUNT III– BREACH OF CONTRACT

103.    ART re-alleges and incorporates by reference all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

104.    The PRS Agreement constitutes a valid, binding contract between ART and HL.

105.    ART has fully performed its obligations under the PRS Agreement.

106.    HL has breached the PRS Agreement by, among other things:

   (i)     wrongfully failing and refusing to post Credit Support in response to ART's July 21 demand;

   (ii)    wrongfully failing and refusing to pay ART the Q2 2021 Cash Settlement Amount when due; and

   (iii)   wrongfully failing and refusing to pay to ART the Disputed Q1 2021 Cash Settlement Amount when due.

107.    HL's breaches were not timely cured and therefore ripened into Events of Default under the PRS Agreement.

108.    ART declared each of these Events of Default, and based upon them, declared the Early Termination Date for the Swap to be August 14, 2021.

109.    HL owes ART an Early Termination Amount of $203,321,806, together with contractually mandated Default Interest and ART's out-of-pocket expenses, including legal fees.

29

4857-5858-0701.1

110.    HL was required to pay the Early Termination Amount, together with contractually mandated Default Interest and ART's out-of-pocket expenses on August 30, 2021. HL did not timely pay any of these amounts and to date has not paid any part of them.  HL has breached the PRS Agreement by failing to pay these amounts.

111.    As a direct and proximate result of HL's breaches, individually and collectively, ART has been damaged in an amount to be determined at trial and in all events at least $203,321,806 together with Default Interest.

## PRAYER FOR RELIEF

WHEREFORE, ART respectfully prays for judgment in its favor as follows:

(a)    Declaring that HL's designation of an Event of Default and Early Termination Date is invalid and of no force and effect;

(b)    Declaring that ART's designations of Events of Default and an Early Termination Date are valid;

(c)    Declaring that HL has breached the PRS Agreement;

(d)    Awarding ART damages for HL's breaches in an amount to be determined at trial, and in all events at least $203,321,806;

(e)    Awarding ART Default Interest as defined in the PRS Agreement;

(f)    Awarding ART pre-judgment and post-judgment interest on the maximum amount of damages and to the maximum extent permitted by applicable law;

(g)    Awarding ART its out-of-pocket expenses, including attorneys' fees, as provided for in the PRS Agreement or otherwise; and

(h)    Granting ART such other and further relief as the Court deems just and proper.

30

4857-5858-0701.1

Dated:   New York, New York
         August 29, 2024

                                           FRIEDMAN KAPLAN SEILER
                                             ADELMAN & ROBBINS LLP

                                           *s/ Daniel B. Rapport*
                                           Daniel B. Rapport (drapport@fklaw.com)
                                           Anne E. Beaumont (abeaumont@fklaw.com)
                                           7 Times Square
                                           New York, New York 10036-6516
                                           (212) 833-1100

                                           *Attorneys for Plaintiff*
                                           *Allianz Risk Transfer (Bermuda) Limited*

4857-5858-0701.1