UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALLIANZ RISK TRANSFER (BERMUDA) LIMITED,

               Plaintiff,

               -against-

HILO WIND POWER, LLC,

               Defendant.

No. 1:22-cv-05133 (GHW)

ORAL ARGUMENT
REQUESTED

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RULE 37(e) SPOLIATION SANCTIONS

Dated:  May 22, 2026

GIBSON, DUNN & CRUTCHER LLP
Gabriel Herrmann
Rahim Moloo
Esther Lifshitz
200 Park Avenue, 47th Floor
New York, NY 10166
Telephone: (212) 351-4000
Email:  gherrmann@gibsondunn.com
rmoloo@gibsondunn.com
elifshitz@gibsondunn.com

Peter M. Wade
1700 M Street, N.W.
Washington, DC 20036
Telephone: (202) 777-9529
Email: pwade@gibsondunn.com

*Attorneys for Defendant High Lonesome Wind Power, LLC*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT BACKGROUND....................................................................................................4

    A.    The Parties Execute the PRS, Which Requires "Commercially Reasonable" Calculation of a "Commercially Reasonable" Close-Out Amount.....................................4

    B.    ART Engages Ascend in Anticipation of Litigation to Conduct a Fundamentally Unreliable Close-Out Valuation that Produces Three Wildly Different Estimates.......................................6

    C.    ART Fails to Preserve and Ascend Destroys Critical Data Underlying Its Analyses .................................................................9

    D.    The 2025 Attempted "Re-creation" Confirms Irreplaceability.................................................................................11

    E.    HiLo's Expert Opines that the Reliability and Commercial Reasonableness of Ascend's Work Cannot be Established Without the Deleted Data, and that the Available Data Demonstrates that Ascend's Work Was Not Commercially Reasonable or Reliable ...........................................................12

LEGAL STANDARD..................................................................................................................13

ARGUMENT ..............................................................................................................................14

    I.    There Is No Dispute that ART and Ascend Were Required to Preserve the Spoliated Data..........................................................................14

        A.    Both ART and Ascend Reasonably Anticipated Litigation When ART Engaged Ascend to Conduct the 2021 Valuation ............................................................................................15

        B.    ART Had Control Over and Is Responsible for the Spoliated Evidence....................................................................16

    II.    ART and Ascend Failed to Take Reasonable Steps to Preserve the Spoliated Data.......................................................................................17

    III.    The Spoliated Data Cannot Be Restored or Replaced Through Additional Discovery.......................................................................................19

i

**TABLE OF CONTENTS**
*(Continued)*

Page(s)

IV.    ART's Spoliation Has Materially Prejudiced HiLo ............................................. 20

V.    Sanctions Are Warranted to Address the Prejudice Caused by ART's Spoliation ................................................................................................................ 23

CONCLUSION ...................................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

## Cases

*CAT3, LLC v. Black Lineage, Inc.*,
164 F. Supp. 3d 488 (S.D.N.Y. 2016)................................................................19

*Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*,
337 F.R.D. 47 (S.D.N.Y. 2020)........................................................................25

*Eur. v. Equinox Holdings, Inc.*,
592 F. Supp. 3d 167 (S.D.N.Y. 2022)................................................................19

*GenOn Mid-Atl., LLC v. Stone & Webster, Inc.*,
282 F.R.D. 346 (S.D.N.Y. 2012), *aff'd*, 2012 WL 1849101 (S.D.N.Y. May 21,
2012) ..........................................................................................................16

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
257 F.R.D. 334 (D. Conn. 2009)................................................ 17, 19, 21, 22, 24

*Karsch v. Blink Health Ltd.*,
2019 WL 2708125 (S.D.N.Y. June 20, 2019)........................ 13, 14, 17, 23, 25, 26

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
341 F.R.D. 474 (S.D.N.Y. 2022)................................................................ 14, 18

*Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*,
880 F.3d 620 (2d Cir. 2018)............................................................................23

*Leidig v. Buzzfeed, Inc.*,
2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017)......................................................19

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018)......................................... 13, 24, 26

*Mazzei v. Money Store*,
2014 WL 3610894 (S.D.N.Y. July 21, 2014)......................................................15

*Medcenter Holdings Inc. v. Web MD Health Corp.*,
734 F. Supp. 3d 303 (S.D.N.Y. 2024)...........................................................24, 25

*Moody v. CSX Transportation, Inc.*,
271 F. Supp. 3d 410 (W.D.N.Y. 2017)..........................................................14, 18

*Nurmagomedov v. Legionfarm, Inc.*,
2024 WL 4979235 (S.D.N.Y. Dec. 4, 2024)........................................................18

*Ottoson v. SMBC Leasing & Fin., Inc.*,
268 F. Supp. 3d 570 (S.D.N.Y. 2017)................................................................14

# TABLE OF AUTHORITIES
*(Continued)*

Page(s)

*Painadath v. Good Shepherd Penn Partners*,
348 F.R.D. 16 (E.D. Pa. 2024) ...............................................................................23

*Ronnie Van Zant, Inc. v. Pyle*,
270 F. Supp. 3d 656 (S.D.N.Y. 2017), *rev'd on other grounds*, 906 F.3d 253
(2d Cir. 2018)..........................................................................................................15

*Sekisui Am. Corp. v. Hart*,
945 F. Supp. 2d 494 (S.D.N.Y. 2013)......................................................................17

*State Farm Fire & Casualty Co. v. Frigidaire*,
146 F.R.D. 160 (N.D.Ill. 1992) ..............................................................................24

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003)....................................................................... 14, 18

## Rules

Fed. R. Civ. P. 37(e)................................................................................... 2, 13, 19

iv

Defendant High Lonesome Wind Power, LLC ("HiLo") respectfully submits this memorandum of law in support of its motion for spoliation sanctions against Plaintiff Allianz Risk Transfer (Bermuda) Limited ("ART"), pursuant to Federal Rule of Civil Procedure 37(e).

**PRELIMINARY STATEMENT**

This motion seeks to remedy ART's admitted failure to take any steps to preserve critical electronic data underlying the $75 million ART claims as alleged Close-out Amount damages. The parties' Proxy Revenue Swap agreement (the "PRS") required that any Close-out Amount be determined in good faith using commercially reasonable procedures in order to produce a commercially reasonable result. Whether ART's claimed Close-out Amount meets that standard is now a central issue in this litigation. But the process ART used to calculate the Close-out Amount is a black box, in part because ART failed to preserve the critical data used to determine the Close-out Amount, and because Ascend Analytics ("Ascend"), the consultant that ART engaged to perform the calculation, intentionally destroyed this data in violation of its own policies. Such blatant spoliation is utterly inexcusable, particularly given that both ART and Ascend knew from the outset that Ascend's work was for purposes of litigation and, as such, must be preserved.

Specifically, ART and Ascend failed to preserve three categories of critical information: (i) the "input file" containing the "several hundred parameters" Ascend purportedly fed into its proprietary modeling software in order to generate its 2021 valuations of the PRS; (ii) the "raw data files" that purportedly were the outputs of that modeling process; and (iii) the version of Ascend's proprietary model that existed in 2021. Both ART and its agent Ascend had a duty to preserve this information. ART did not retain a copy of this information in its records or direct Ascend to do so. And while Ascend admits that it knew it was required to preserve this information in anticipation of litigation, it did not do so. Indeed, Ascend admits that it deleted one component of the data—the "raw data" outputs of its modeling process—as a matter of "standard practice" to avoid data storage costs, even

1

though it could have easily made an exception for the litigation-support work product at issue here. ART could have also covered the cost of retaining that data as part of Ascend's engagement or offered to host that data itself to ensure proper preservation. As for the most critical component, the input file that contained all the inputs, assumptions, and parameters that drove Ascend's results and are essential to understanding whether Ascend's calculations are in any way reasonable or reliable, Ascend personnel *affirmatively marked the data for deletion* during a computer-system upgrade in 2023, many months after ART had commenced litigation.

The spoliated data cannot be "restored or replaced through additional discovery," Fed. R. Civ. P. 37(e). In tacit recognition of the critical nature of the data that was spoliated, ART paid Ascend to attempt to "re-create" the data in connection with this litigation more than twice what it paid Ascend for the original 2021 work. But there is no reliable evidence that the "re-created" data actually replicates what was used and done in 2021 to determine the Close-out Amount. It was created by analysts who did not work for Ascend in 2021 and had no involvement in the 2021 project, using a version of Ascend's model that did not exist in 2021. And tellingly, when Ascend attempted to use that "re-created" data to redo its analysis, it produced a result that *did not match* any of the *three* disparate results Ascend provided to ART in 2021—results ranging from just over $40 million to just over $90 million—each of which Ascend had contemporaneously declared to be "fair and accurate" valuations of the PRS. The "re-creation" also took nearly two months, whereas the original engagement took two weeks, and Ascend has not explained how many "re-created" input and output files it generated or tested in that period of time, or provided any comfort that it was not simply working backwards to the number ART seeks to use in this litigation. These facts not only render Ascend's "re-creation" efforts utterly unreliable and irrelevant, but also underscore how critical and prejudicial the loss of this data is to this case.

The prejudice to HiLo is severe.  The PRS's "commercially reasonable" standard demands transparency, reproducibility, and verifiability in ART's Close-out Amount calculation.  ART has argued that that standard requires proof that the assumptions and inputs Ascend used to drive its analyses are consistent with industry standards and practices.  Yet by destroying those inputs and assumptions, ART and Ascend have prevented HiLo from assessing Ascend's work and rebutting ART's claim of supposed "commercial reasonableness."  HiLo cannot test the inputs Ascend purportedly used; cannot run those inputs through the version of the model Ascend purportedly used; cannot determine what changed between the three different, supposedly "fair and accurate," valuations Ascend produced in August 2021 (which spanned a range of *$50 million*); cannot check the reliability of Ascend's calculations; and cannot evaluate whether the dozens of unstated assumptions and parameters embedded in Ascend's proprietary, black-box approach are consistent with industry standards.  HiLo cannot even evaluate whether the "re-creation" in fact accurately represents the original data.  As HiLo's valuation and industry expert Seabron Adamson has explained—in opinions ART does not rebut with any expert testimony of its own—the destruction of this data fundamentally undermines any claim that ART's Close-out Amount can be evaluated for commercial reasonableness, much less shown to satisfy that standard.

The seriousness of this loss cannot be overstated, and serious sanctions are warranted to address this prejudice under Rule 37(e)(1).  HiLo respectfully submits that the appropriate remedies include precluding ART from offering either Ascend's unverifiable 2021 valuations or its 2025 attempted "re-creation" as evidence of the Close-out Amount or its commercial reasonableness.  HiLo should also be awarded the significant fees and costs it has been forced to expend as a result of the spoliation, including as a result of the substantial additional work required during discovery to investigate and pursue the spoliated data, and in connection with this motion.

For the reasons set forth below, HiLo's motion should be granted.

## RELEVANT BACKGROUND

### A.    The Parties Execute the PRS, Which Requires "Commercially Reasonable" Calculation of a "Commercially Reasonable" Close-Out Amount

In 2019, HiLo and ART entered into a 10-year Proxy Revenue Swap ("PRS") relating to HiLo's Texas windfarm.[1]  ECF 109-01; ECF 106 ¶ 312.  ART, with its partners Nephila Capital and REsurety, Inc., invented the PRS as a risk-transfer product and marketed it to purchasers like HiLo as an instrument to hedge against the risk of weather-driven volatility.  ECF 106 ¶¶ 316-21. Whether HiLo or ART validly terminated the PRS, and the consequences of that determination, are the subject of pending cross-motions for summary judgment.  *See* ECF 89; ECF 112.

Under the PRS, HiLo was to pay ART a one-time premium of $5,900,000 and an annual premium of $619,000, and ART was to provide HiLo with a quarterly fixed payment of $5,177,000, netted against a "floating payment" equal to HiLo's "Proxy Revenue."  ECF 109-01. HiLo's Proxy Revenue is calculated based on the windfarm's expected electricity production for a given period and real-time prices in the relevant market.  *Id*.  If the Proxy Revenue fell below the fixed payment amount, ART would pay the difference to HiLo, and vice versa.  *Id*. This hedging arrangement provided HiLo with some certainty of cashflows regardless of the volatile energy prices and weather conditions, in exchange for millions of dollars in premiums and reduced "upside" in the event of outperformance.  *See* ECF 110-1 ¶¶ 21-29.

In February 2021, ART exploited an unprecedented "black swan" weather event—which caused market-wide production curtailments and unforeseeable regulatory manipulation of market

---

[1] The PRS is documented in several related instruments, including a standard-form 2002 ISDA Master Agreement ("Master Agreement") and an Amended and Restated Confirmation ("Confirmation").  ECF 109-1 and 109-52–109-55.

prices—as an opportunity to demand a $129 million windfall payment from HiLo. ECF 106 ¶ 328. HiLo disagreed with the demand and invoked the PRS's contractual dispute-resolution procedures. *Id.* ¶¶ 345-49. When, after months of back and forth, ART refused to comply with those procedures, HiLo terminated the agreement. ECF 109-39; ECF 109-88. Several weeks later, ART sought to declare its own termination of the PRS (even though it had already been terminated by HiLo), and, on August 30, 2021, claimed it was owed over $200 million as an "Early Termination Amount" under the PRS. ECF 109-100.

An Early Termination Amount is a payment owed in the event of an early termination of the PRS, and consists of any "Unpaid Amounts" due and payable as of the Early Termination Date, and a "Close-out Amount" calculated by the terminating party. ECF 109-52 §§ 6, 14. The PRS defines the Close-out Amount as "the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances…or gains of the Determining Party that are or would be realized under the circumstances…in replacing, or in providing for the Determining Party the economic equivalent of…the material terms of that Terminated Transaction." *Id.* § 14. The PRS does not mandate a specific methodology for determining the Close-out Amount, but requires that the determining party must "act in good faith" and calculate the Close-out Amount "us[ing] commercially reasonable procedures in order to produce a commercially reasonable result." *Id.* Procedures are deemed to be "commercially reasonable" if they involve "application...of pricing or other valuation models that are...used by the *Determining Party*"—in this case ART—"in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction." *Id.* (emphasis added).

For reasons it has not explained, ART chose not to use its own internal valuation models to value the remainder of the terminated PRS here. Instead, it hired Ascend, a third party it had never engaged before (and has not used since) and that had never calculated a Close-Out Amount due under a PRS, to perform a one-off analysis in support of ART's damages claim. Ex. 107 (Dorris Tr.) at 48-49, 165-66;[2] ECF 109-68 at 109-10, 112-13.

### B. ART Engages Ascend in Anticipation of Litigation to Conduct a Fundamentally Unreliable Close-Out Valuation that Produces Three Wildly Different Estimates

On or about August 11, 2021, long after this dispute first arose and HiLo terminated the PRS, ART engaged Ascend to conduct a valuation of the remainder of the PRS for purposes of calculating the Close-out Amount. ECF 109-45; ECF 109-77. Ascend understood from the outset that ART had hired it for "Litigation Support." ECF 109-47; ECF 109-48. Indeed, Ascend described its role as providing "the defensible valuation that [ART] require[s] for a relatively painless litigation process." ECF 109-48. Ascend further understood that, because Ascend's work would likely be used in impending litigation, all underlying data must be preserved. Ex. 107 (Dorris Tr.) at 168-71, 301; ECF 109-48; ECF 109-49; ECF 109-50.

Ascend's corporate representative and CEO, Gary Dorris, testified unequivocally on these points. Dr. Dorris admitted that when "first engaged," Ascend was aware the engagement concerned a contract "dispute" and that "litigation between the parties to the contract was a possibility." Ex. 107 (Dorris Tr.) at 169. He further admitted that "Ascend underst[ood] at the time that there was a need to preserve its work product documents and communications relating to the calculation of the close-out amount," because "in litigation you keep the materials." *Id.* at 169-70. This understanding did not come from ART, who provided no "explicit instruction" on data

---

[2] "Ex." is to the Declaration of Peter Wade, filed concurrently in support of HiLo's motion.

preservation, but from Ascend's prior work supporting other clients in their disputes. *Id.* at 170. Accordingly, Ascend has a data-retention policy—which Dr. Dorris described as "pretty rigorous"—requiring that it "keep the data" involved in "engagements related to litigation," like the ART engagement. *Id.* at 170-71.

For this engagement, Ascend claims to have estimated the value of ART's expected future payments under the PRS over its remaining term. To do so, Ascend purported to use its own proprietary price forecasts for the Electric Reliability Council of Texas ("ERCOT") market and its own complex, proprietary econometric models that, it claimed, could estimate both the windfarm's future power generation and hypothetical future hourly spot-market prices for years into the future. Ascend's forecasts and modeling exercises required "a significant number of inputs and assumptions about, among other things, the weather, the economy, commodity prices, and the ERCOT market." ECF 110-1 ¶ 38. Ascend started by creating an "input file" "containing several hundred parameters to be used in the analysis and historical data for the project," ECF 109-50, including, *e.g.*, forecasted energy prices, capacity expansion/supply stack assumptions, forecasted hourly prices, renewable tax credit assumptions, and carbon price assumptions, among many others. Ex. 107 (Dorris Tr.) at 90-110, 150-51 (Ascend CEO describing generally the various critical inputs in the input file and their sources, including from ART itself and other Ascend teams and simulations); ECF 110-1 ¶¶ 39, 119, 126, 130, 161-68; ECF 109-69 at 226-27.[3] Ascend then

---

[3] The data included in the "input file" itself stemmed from multiple different proprietary models that Ascend used. ECF 110-1 ¶¶ 14, 38-39, 118, 124. Thus, the assumptions used in the "input file" were themselves the product of further assumptions and data selected by different Ascend modeling teams that HiLo has no insight into. For example, a separate "Market Intelligence" team within Ascend produced the fundamental price forecasts for the ERCOT South Hub market using simulation tools that were not disclosed to HiLo, that Ascend personnel could not explain to HiLo's expert, Mr. Adamson, and that Dr. Dorris admitted cannot be reproduced from the materials that Ascend has produced in this litigation. *Id.* ¶¶ 39, 118-19, 134-35; ECF 109-69 at 184-85, 189-92;

fed its input file into its proprietary "PowerSIMM" model[4] to generate a series of "raw data" output files.[5] ECF 110-1 ¶ 39. The data selected for the input file and the parameters imposed determined what the modeling "raw data" output would be, and thus Ascend's projection of HiLo's future proxy revenues. Once it had projected HiLo's future proxy revenues, Ascend subtracted the PRS's fixed payment amounts to arrive at the undiscounted total payments it estimated would have been owed to ART over the PRS's lifetime. *Id.* ¶ 41.

Over the course of approximately two weeks, Ascend produced three formal valuation letters to ART—each signed by Ascend's CEO, each containing what Dr. Dorris declared to be a "fair and accurate valuation" of the very same contract, and each derived from purportedly the same model and price forecasts. ECF 109-79; ECF 109-82; ECF 109-105 at -7397. The three letters are essentially identical except for the reported result. On August 18, 2021, Ascend claimed a valuation of $91.5 million. ECF 109-82. On August 22, 2021, following discussions with ART and its partner Nephila Capital, Ascend sent a second, but still purportedly "fair and accurate," valuation of $43.9 million. ECF 109-79. ART's outside litigation counsel then directed Ascend to "rerun" the calculation using new data not previously provided to Ascend. ECF 109-74; ECF 109-81. On August 27, 2021, Ascend sent ART a third valuation of $77.8 million, also described

---

Ex. 107 (Dorris Tr.) at 93-94. The spoliated "input file" was the only evidence tying the Market Intelligence forecasts and other inputs to the PowerSIMM modeling run that produced the 2021 valuation results.

[4] Ascend's PowerSIMM is not a single model but a "suite" of proprietary sub-models, each with its own assumptions, inputs, and calculations, that purportedly (i) simulate the hourly output based on weather data, (ii) simulate the variation in monthly forward power prices, tied to the Market Intelligence forecasts, (iii) simulate the variation in day-ahead hourly power prices, and (iv) estimate real-time prices from those day-ahead prices. Only from those price and quantity simulations is the hypothetical proxy revenue under the PRS derived. ECF 110-1 ¶¶ 124-25.

[5] The "raw data" files include On-Peak (ERCOT\SPP), Off-Peak (ERCOT\SPP) and WXSimRep, and "PowerSimm Books and PowerSIMM Items are subsets of or based on specific variables contained in the 'raw data' file." ECF 109-50.

as "fair and accurate." ECF 109-105 at -7397. ART ultimately selected this third valuation of the PRS and discounted it to present value using a "risk-free" discount rate to arrive at its demanded $75 million Close-out Amount. ECF 109-100. No objective criteria changed across the three valuations, only the inputs and parameters that Ascend and ART used to manipulate the methodology.

ART has never fully explained how Ascend, applying purportedly the same methodology, could generate three valuations spanning a $50 million range, and yet declare each to be a "fair and accurate" valuation of the same instrument. And, critically, none of the "input files" used for these three valuations—or the "raw data" outputs from the modeling exercises conducted during these two weeks—were preserved by either ART or Ascend.

## C.    ART Fails to Preserve and Ascend Destroys Critical Data Underlying Its Analyses

During discovery, HiLo requested from ART all data underlying its Close-out Amount. Ascend was also subpoenaed in this action and, through its counsel—the same counsel representing ART—agreed to produce "all documents and data considered or relied upon in [Ascend's] calculations, determinations, or analysis." ECF 109-104. Only after HiLo had identified serious deficiencies with Ascend's subsequent productions, however, did Ascend admit that it had deleted both the "input file" used for its 2021 analyses, and the "raw data" output files produced using those inputs. Ex. 107 (Dorris Tr.) at 169-74, 293-307; ECF 109-49.

### 1.    The Input File

As described above, the "input file" is the most critical piece of underlying data for Ascend's 2021 valuation work. It contains the "several hundred parameters" that Ascend fed into its valuation model, and which drive the results of that model. ECF 109-50; *see* ECF 110-1 ¶ 38.

9

ART and Ascend's counsel's explanation for the destruction of this file changed several times over the course of discovery.  First, in June 2025, counsel for ART and Ascend stated that the input file had been "corrupted" during a cyberattack in August 2024.  ECF 109-50.  Then, in July 2025, counsel retracted the cyberattack story and represented instead that the file was "accidentally deleted by Ascend in March 2023 in connection with a computer upgrade at Ascend."  ECF 109-51.  Counsel changed its story yet again on August 15, 2025, confessing that, rather than being accidentally deleted, as previously claimed, "the data in question were marked for deletion" by Ascend personnel when Ascend upgraded its database management system in 2023.  ECF 109-49 at 3.  Ascend's corporate representative further admitted that the 2023 deletion—which occurred more than 10 months after ART filed this lawsuit—was intentional and violated Ascend's own data-retention policies.  Ex. 107 (Dorris Tr.) at 169-73, 301-05.

### 2.  The Output Files

ART and Ascend's counsel also admitted that Ascend had deleted the "raw data" files generated contemporaneously during the performance of its work for ART in 2021, which contained the outputs of Ascend's modeling exercises.  ECF 109-50.  Unlike the input file, Ascend deleted the data at the outset, and intentionally never sought to preserve it.  Even though "Ascend understood that its work needed to be preserved" for this litigation, Ascend concedes that it nevertheless deleted the output files "as a matter of course," due to concerns that retaining such data would "increase data storage costs."  ECF 109-49 at 2.  Ascend's corporate representative further admitted at deposition that Ascend "could have" preserved the deleted litigation-related data, but that Ascend simply did not do so (and ART did not instruct it to do so).  Ex. 107 (Dorris Tr.) at 295-96.  Neither counsel nor Ascend has ever quantified what the cost would have been to retain only the outputs related to Ascend's work for ART, or otherwise explained why an exception to Ascend's "standard practice" was not made for this litigation-support data.

### 3. The 2021 Model

In addition to the input and output files, Ascend has admitted that it did not preserve and cannot use the proprietary PowerSIMM model that was used for the 2021 analysis. Ex. 107 (Dorris Tr.) at 26-28, 68-69. Ascend's model has been "updated and revised repeatedly" since 2021. ECF 117 at 2. The 2021 version of the model apparently cannot be recovered. Ascend's corporate representative admitted that Ascend *could have* preserved the 2021 model for use in 2025, but that it failed to do so. Ex. 107 (Dorris Tr.) at 68-69. He also admitted that "it is not possible" to recreate "any of the analyses underlying the three results Ascend provided to [ART] in 2021," in part, because there is "incompatibility with our current code to go back in time" to the model version that Ascend used in 2021. Ex. 107 (Dorris Tr.) at 310-11.

Despite knowing that Ascend's work was being performed for litigation purposes, and in support of a massive claim for no less than $75 million, ART made no effort to preserve, or to instruct Ascend to preserve, the data underlying that work. Ascend's CEO testified that ART provided no "explicit instructions" to Ascend with respect to data preservation—either at the outset of the engagement or after the litigation was filed. Ex. 107 (Dorris Tr.) at 170. Nor is there any evidence that ART even asked Ascend to provide it with all critical data justifying its Close-out Amount demand when Ascend produced its three valuations in 2021.

### D. The 2025 Attempted "Re-creation" Confirms Irreplaceability

It is undisputed that all of this destroyed data could not be recovered. However, after admitting to the spoliation in summer 2025, Ascend offered to "attempt to replicate" the input and output files—though any replicated data would not be the actual data used by Ascend in 2021—and that doing so would take approximately five weeks. *See* ECF 109-50. This exercise, in fact, took approximately two months, even though Ascend conducted the original valuation analyses in a matter of days.

Ascend produced documents reflecting its attempted re-creation of one of the deleted 2021 input files, as well as new raw data files produced by loading that new input file into a new version of the Ascend proprietary model that did not exist in 2021. ECF 110-1 ¶ 55. Ascend also provided the result of a "re-created" 2025 analysis using that data, which did not match any of the three valuations it had reached in 2021. *Id.* Ascend did not explain its process for its 2025 re-creation, except to note that two analysts who had *not* worked on the original Close-out Amount calculations (and in fact were not with the company in 2021) had attempted to replicate that destroyed analysis based on unspecified "information from exchanges…internally and externally." Ex. 107 (Dorris Tr.) at 24-28.

Neither ART nor Ascend has explained: (i) why the re-creation took four times as long as the original engagement; (ii) how many separate "re-created" input files Ascend generated in 2025 before producing the one ART chose to ultimately disclose to HiLo; (iii) what the results of any discarded re-creation attempts showed; (iv) why exactly the "re-created" 2025 result differs from each of the three 2021 valuation results (by millions of dollars); or (v) what specific information was used to populate each of the "several hundred parameters" in the re-created input file.

**E.      HiLo's Expert Opines that the Reliability and Commercial Reasonableness of Ascend's Work Cannot be Established Without the Deleted Data, and that the Available Data Demonstrates that Ascend's Work Was Not Commercially Reasonable or Reliable**

HiLo's designated expert—Seabron Adamson, an authority on the valuation of renewable-energy contracts and ERCOT forecasting and market dynamics—has explained at length that the spoliated data is critical to evaluating the commercial reasonableness of Ascend's processes and results, and that the loss of that data substantially impairs his ability to do so. *See* ECF 110-1 ¶¶ 100-04, 130-55. Mr. Adamson opines that a commercially reasonable valuation in this context must be "clearly stated and capable of being understood (and audited) by the audience for which

12

the valuation was performed," "readily reproducible by third parties," and "verif[iable] by independent third parties." *Id.* ¶ 148. Ascend's work product is none of those things, especially, but not only, because of the destruction of the input file, output files, and 2021 model code. *Id.* ¶¶ 149-55.

Even when Mr. Adamson met with Ascend personnel in an effort to better understand Ascend's model and methodology, the Ascend representative was unable to adequately explain Ascend's process or how various critical inputs (including its proprietary ERCOT price forecasts) had been derived. *Id.* ¶¶ 134-38, 147; ECF 109-69 at 184:23-185:14, 189:9-192:2. ART has presented no expert testimony rebutting Mr. Adamson's opinions on these points.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 37(e) authorizes sanctions for the spoliation of electronically stored information ("ESI") (i) "that should have been preserved in the anticipation or conduct of litigation," (ii) "is lost because a party failed to take reasonable steps to preserve it," and (iii) "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).

The Court has broad discretion to impose a range of measures aimed at remedying the prejudice caused by Plaintiff's spoliation. Fed. R. Civ. P. 37(e)(1). In addition to monetary sanctions, the Court may also order "more serious measures," such as "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment; *see also Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *13 (S.D.N.Y. June 20, 2019); *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *9 (S.D.N.Y. Mar. 12, 2018). These curative measures are intended to prevent the spoliating party from benefiting from their misconduct, "place the risk of an erroneous judgment on a party

who wrongfully created the risk," deter future wrongdoing, and "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017).

While HiLo has the burden of establishing the threshold elements of spoliation, it need not prove that loss of access to the spoliated evidence is prejudicial to its case. *Karsch*, 2019 WL 2708125, at \*20 (holding that Rule 37(e)(1) "does not place a burden of proving or disproving prejudice on one party or the other," noting that "placing the burden of proving prejudice on the party that did not lose the information may be unfair") (citations omitted). It is enough if the "existing evidence plausibly 'suggests' that the spoliated ESI could support the moving party's case" or "would be helpful to them." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 495 (S.D.N.Y. 2022) (citation omitted); *see also Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 430 (W.D.N.Y. 2017) (finding prejudice where movant made "plausible, concrete suggestions as to what [the destroyed] evidence might have been").

## ARGUMENT

### I.    There Is No Dispute that ART and Ascend Were Required to Preserve the Spoliated Data

There is no dispute that ART was required, but failed, to preserve critical documents and data related to its 2021 valuation of the PRS, which was indisputably conducted in anticipation of litigation. "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). The duty extends not only to ART's own ESI, but to the ESI in the possession of a third party that is within ART's control—*i.e.*, Ascend. *Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 669-70 (S.D.N.Y. 2017), *rev'd on other grounds*, 906 F.3d 253 (2d Cir. 2018).

14

"Control" here is "construed broadly" and does not require either legal ownership or physical possession of the ESI; rather, control exists "if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement." *Id.* (citation omitted); *see also Mazzei v. Money Store*, 2014 WL 3610894, at *3, 8-10 (S.D.N.Y. July 21, 2014). ART hired Ascend in a litigation support role, continues to engage and pay Ascend for this litigation support role, and undeniably had the practical ability to obtain—and thus a responsibility to preserve— Ascend's data. *See Innis Arden Golf Club v. Pitney Bowes, Inc.*, 257 F.R.D. 334, 336 (D. Conn. 2009) (finding that the engagement between plaintiff and the consultant it hired itself reflected anticipation of litigation and plaintiff held responsible for consultant's spoliation of evidence).

### A. Both ART and Ascend Reasonably Anticipated Litigation When ART Engaged Ascend to Conduct the 2021 Valuation

ART was obligated to preserve all documents and data related to its dispute with HiLo over the PRS. This duty attached by April 2021 when HiLo sent ART the Dispute Notice, and was indisputably in place when HiLo terminated the PRS in July 2021. ECF 106 ¶¶ 349, 422-23. At that point, ART was well aware that the matter was likely headed to litigation, and the next month it engaged Ascend for what Ascend expressly understood to be "litigation support."

Both ART and the agent it hired explicitly for litigation purposes understood that Ascend's work was to be used in litigation and therefore must be retained. ECF 109-49; Ex. 107 (Dorris Tr.) at 169-71. Ascend's contemporaneous internal communications referred to the engagement as "Litigation Support" and described the purpose of its work as providing ART "the defensible valuation [it] require[s] for a relatively painless litigation process." ECF 109-48. At deposition, Ascend's corporate representative confirmed that Ascend knew that the matter was going to be litigated and that all underlying data must be preserved. Ex. 107 (Dorris Tr.) at 168-71. Ascend has further admitted that its own internal data-retention policies independently required

15

preservation of all data underlying its valuation work.  Ex. 107 at 169-73, 301; ECF 109-49.  It is therefore indisputable that ART's duty to preserve was firmly in place when Ascend conducted its valuation work, and especially when Ascend destroyed the data underlying that work.

### B.        ART Had Control Over and Is Responsible for the Spoliated Evidence

ART had control over the spoliated data and was responsible for preserving that data.  ART hired Ascend and directed its valuation work.  ART even had its outside litigation counsel instruct Ascend to "re-run" its analyses using data provided by ART (after Ascend's second valuation came in nearly $50 million *less* than the first), which resulted in the $77.8 million result that Ascend now uses in this litigation.  ECF 109-74; ECF 109-78.  Yet, ART did not preserve the data underlying these analyses in its own files or instruct Ascend to do so.

ART certainly had the practical ability to request this data from Ascend and to issue an explicit "evidence-preservation directive." *Innis Arden Golf Club*, 257 F.R.D. at 341 (holding that plaintiff "bears responsibility" for its consultant's "failure to preserve evidence" and ordering sanctions).  ART did neither.  That ART always had the practical ability to obtain the data at issue—*i.e.*, had control over such data—is confirmed by the fact that ART directed Ascend's original 2021 valuation work and the 2025 "re-creation" effort, was able to obtain the "re-created" data Ascend used for its 2025 analyses, and instructed ART's and Ascend's *shared* counsel to produce Ascend's documents in this litigation. *See supra* at 9-12.  It is well settled that "an expert's destruction of evidence can be attributed to its client, the party." *Innis Arden Golf Club*, 257 F.R.D. at 341; *see also GenOn Mid-Atl., LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 353, 358 (S.D.N.Y. 2012), *aff'd*, 2012 WL 1849101 (S.D.N.Y. May 21, 2012) (finding that plaintiff had duty to preserve data of non-party consultant, but finding no prejudice under specific facts distinguishable from those here).

**II.    ART and Ascend Failed to Take Reasonable Steps to Preserve the Spoliated Data**

Neither ART nor Ascend took any steps—let alone "reasonable" ones—to preserve the spoliated data files, as required by Rule 37(e).  In fact, the data files were intentionally, affirmatively destroyed.

ART does not dispute that it failed to preserve the data files used in its 2021 Close-out Amount calculation.  It did not retain a copy of the data for its own records and so could not produce these documents to HiLo during discovery (nor did ART include the data underlying its valuation when it made its $75 million Close-out demand on HiLo on August 30, 2021, *see* ECF 109-100).  *See* ECF 109-49 at 3 (acknowledging that ART did not have Ascend provide it with any of the "raw data or input files from August 2021 that were deleted").  Nothing prevented ART from obtaining a copy of these records from Ascend as part of its engagement.  *See* Ex. 107 at 89-90 (Ascend CEO admitting that it has provided a spreadsheet of key inputs to other clients and that all inputs used for ART's engagement would have been stored on Ascend's servers at the time of the initial engagement).

ART also never provided "explicit instructions" to Ascend to retain the valuation data—either when it engaged Ascend in August 2021 (knowing it was hiring Ascend for "litigation support") or after ART filed this lawsuit in May 2022, or at any other time prior to HiLo's discovery of the spoliation in summer 2025.  Ex. 107 at 170-71.  *Karsch*, 2019 WL 2708125, at *19 (finding a plaintiff's failure to issue a litigation hold is "particularly unreasonable"); *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 507 (S.D.N.Y. 2013) (plaintiff's failure to implement a litigation hold was "inexcusable" given that plaintiff "had full knowledge of the possibility of future litigation"); *Innis Arden Golf Club*, 257 F.R.D. at 343 (plaintiff sanctioned for consultant's spoliation where it failed to issue an evidence-preservation directive).  ART knew that Ascend was using complex proprietary models with hundreds of inputs and outputs, that Ascend was

17

generating files in connection with that work, and that those files would be discoverable in the litigation that ART itself was planning to bring, in which the commercial reasonableness of Ascend's calculations would be a central issue. And given the sheer size of ART's claimed Close-out Amount—and that the parties were already in a dispute over the Cash Settlement Amount and who validly terminated the PRS—it was by that time beyond dispute that Ascend's calculations and work product were evidence relevant to the parties' dispute. Yet ART did *nothing* to preserve this data. *Moody*, 271 F. Supp. 3d at 426 (party's failure over a four-year period to confirm that relevant files were "complete and accessible" was unreasonable and warranted sanctions); *In re Keurig*, 341 F.R.D. at 495 (Parties and their counsel "*must also take affirmative steps* to monitor compliance so that all sources of discoverable information are identified and searched.") (citation omitted) (emphasis added).

Likewise, Ascend admits that it failed to preserve critical input and output data notwithstanding its acknowledged duty to do so. *See, e.g.*, *Nurmagomedov v. Legionfarm, Inc.*, 2024 WL 4979235, at *4 (S.D.N.Y. Dec. 4, 2024) (ruling that "[n]on-parties that 'control' relevant evidence owe the same preservation duties as parties," and finding plaintiff's manager had duty to preserve communications and was "legally obligated to take 'reasonable steps to preserve' relevant evidence," even though he was a non-party). Although ART tried to justify Ascend's spoliation of the output files as its standard practice, it is well established that once a duty to preserve attaches, a company must "suspend" its "routine document retention/destruction policy." *Zubulake*, 220 F.R.D. at 218. Ascend admitted that nothing prevented it from departing from its standard practice to preserve litigation-related data. Ex. 107 (Dorris Tr.) at 296. ART failed to instruct Ascend to do so. As for the spoliated input file, Ascend conceded that it intentionally marked the input file for deletion, after litigation had commenced, in admitted violation of its own policies. Ex. 107

18

(Dorris Tr.) at 169-71, 300-04; ECF 109-49. Neither Ascend nor ART even inquired into the "unavailability of the input file" until May 2025. ECF 109-49 at 3. Moreover, Ascend admitted outright that it did not take adequate steps to ensure its work for this matter was preserved. Ex. 107 (Dorris Tr.) at 304. And Ascend's spoliation is "attributed to" ART. *Innis Arden Golf Club*, 257 F.R.D. at 341. None of this conduct can be considered "reasonable" preservation efforts.

### III.    The Spoliated Data Cannot Be Restored or Replaced Through Additional Discovery

The deleted input and output data are not recoverable and they cannot be obtained from another source. *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at \*13 (S.D.N.Y. Dec. 19, 2017) (deleted metadata not replaceable "through additional discovery" under Rule 37(e) and a copy of the ESI without the deleted metadata is not an "adequate substitute" for original ESI). In considering whether deleted ESI is replaceable, courts look to whether an *actual* copy of the ESI exists elsewhere. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("Because electronically stored information often *exists in multiple locations*, loss from one source may often be harmless when substitute information can be found elsewhere.") (emphasis added). Even a "near-duplicate" version of ESI "is not an adequate substitute" for destroyed ESI under Rule 37(e). *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016); *see also Eur. v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 176 (S.D.N.Y. 2022) (finding that existing evidence that could be used to develop a "close approximation" of destroyed ESI is not a substitute for the destroyed ESI).

No other entity has a copy of the destroyed data. Among the inputs Ascend purportedly used in 2021 were Ascend's own proprietary forecasts, judgments, data, and model parameters; the destroyed outputs were generated using these inputs and with a specific version of Ascend's proprietary modeling software that no longer exists. The data resided exclusively with Ascend— as ART never obtained a copy—and once destroyed, cannot be retrieved from anywhere else.

19

Ascend's 2025 attempted "re-creation" of its valuation analysis is not a substitute for the spoliated data.  The 2025 data is not a recovered copy of the 2021 data—it was manufactured in 2025 for purposes of this litigation, and there is no basis to assess whether and to what extent it is consistent with the 2021 input files Ascend used to run its three analyses.  Indeed, Ascend acknowledged that any attempt to replicate the spoliated data would not be the actual data used by Ascend in 2021 for ART's Close-out Amount.  ECF 109-50; Ex. 107 at 295-96.  The 2025 "re-creation" is simply a separate set of data used for another valuation conducted by Ascend four years after the original calculation that is at issue in this case.  The two valuation exercises were done by different teams, using different versions of Ascend's modeling software, relying on different information, and producing different results.  Further, there is no evidence in the record to suggest the "re-creation" exercise was aimed at faithfully reproducing the content of the destroyed input file, rather than simply working backwards from ART's damages claim to generate a new input file that would yield a similar result.  This "re-created" data is thus unreliable, inadmissible, and inadequate as a substitute for the actual data used to generate ART's claimed Close-out Amount.  ECF 110-1.

## IV.    ART's Spoliation Has Materially Prejudiced HiLo

The spoliation of the actual data, inputs, and assumptions Ascend used to calculate ART's claimed Close-out Amount has substantially impaired HiLo's ability to assess and challenge the reasonableness of ART's Close-out Amount calculation, including the processes, inputs, and assumptions Ascend used to arrive at that estimate.  That is a *central* issue in this case.  The PRS requires that the Close-out Amount be determined in "good faith" using "commercially reasonable procedures in order to produce a commercially reasonable result."  ECF 109-52 § 14.  ART failed to preserve the data that is critical to determining whether it adhered to those contractual obligations.

20

As HiLo's expert Seabron Adamson explained in a thorough report, a commercially reasonable valuation in the context at issue must be transparent, reproducible, and verifiable—ART's Close-out Amount calculation is none of those. ECF 110-1 ¶¶ 100–04, 130–55. Even with the "re-created" analyses Ascend produced, HiLo does not have sufficient information to evaluate Ascend's calculations, test Ascend's assumptions, or to determine what Ascend did back in 2021 to produce three wildly different valuations, spanning a $50 million range, that somehow all (according to Ascend) represented "fair and accurate" valuations of the same asset. Ascend's methodology clearly was not reproducible, as the 2025 "re-creation" is millions of dollars off from ART's 2021 claimed Close-out Amount. The destruction of the input file, output files, and 2021 model code makes Ascend's methodology fundamentally unverifiable.

- **_HiLo cannot test or rebut Ascend's assumptions._** Ascend purportedly used "several hundred parameters" in its 2021 analysis. ECF 109-50. Without the input file, HiLo cannot determine what those parameters were, much less test whether they were reasonable or inquire as to how they were derived and selected. ECF 110-1 ¶¶ 38, 126-31. In fact, Ascend's own personnel were not even able to provide a full account of the inputs for the "re-created" 2025 input file, much less the original. *Id.* ¶¶ 134-35. *See, e.g.*, *Innis Arden Golf Club*, 257 F.R.D. at 343 (finding prejudice and imposing sanctions where plaintiff's expert's destruction of underlying evidence that the expert relied upon "hampered" defendant's "capacity to challenge the underlying foundations for the experts' opinions"). HiLo cannot know whether the hundreds of inputs and parameters used in the 2025 "re-creation" were the same in either type or value as those used in 2021, whether the purportedly "close" result of Ascend's 2025 "re-creation" was merely the product of

21

Ascend working iteratively toward the 2021 number it wished to replicate, or how many times Ascend had to run its 2025 model in order to produce that result.

- ***HiLo cannot reconcile the three 2021 valuations.*** Ascend produced three valuations spanning a $50 million range, each of which it characterized as "fair and accurate" valuations of the PRS. ECF 109-79; ECF 109-82; ECF 109-105 at -7397. Without the input files corresponding to each valuation, HiLo cannot determine which inputs changed between iterations (if any), why those changes produced such dramatic differences in the valuation of a single asset, or whether ART or Ascend had a reasonable basis to select one particular iteration over another, regardless of methodology.

- ***HiLo cannot meaningfully cross-examine Ascend's witnesses.*** Cross-examination of any Ascend witness about the 2021 analysis is hopelessly compromised by the absence of the underlying data. Ascend's personnel cannot be confronted with the specific inputs they used or changed; at best, they can only describe the methodology in general terms. Moreover, the Ascend personnel who conducted the 2025 "re-creation" did not even work on the original 2021 valuation, and, at most, reviewed some unspecified "exchanges" related to the 2021 valuation. Ex. 107 at 23-27. *See, e.g.*, *Innis Arden Golf Club*, 257 F.R.D. at 341 (finding prejudice where defendant "cannot effectively challenge [plaintiff's] expert" due to destroyed evidence).

- ***ART itself relies on the destroyed data's purported existence.*** ART's entire claim for a $75 million Close-out Amount rests on the premise that Ascend's 2021 work product is reliable and the product of commercially reasonable inputs and assumptions. In essence, ART asks the factfinder to *assume* that Ascend's analyses were based on reasonable assumptions and data, and to credit Ascend's estimate while simultaneously precluding

22

HiLo from examining the inputs and processes that generated it.  Rule 37(e) does not permit a party to weaponize its own spoliation in that manner.

Accordingly, the prejudice to HiLo from this spoliation is severe and warrants curative measures.

## V.    Sanctions Are Warranted to Address the Prejudice Caused by ART's Spoliation

Rule 37(e) provides the Court with broad discretion to fashion an appropriate remedy to address the substantial prejudice caused by ART's spoliation.  *Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 630-31 (2d Cir. 2018).  HiLo respectfully submits that the following curative measures are appropriate under Rule 37(e)(1):[6]

*First*, the Court should, at minimum, preclude ART from offering Ascend's 2021 valuations or its 2025 "re-creation" data as evidence of the Close-out Amount.  Anything less would leave ART free to extract a $75 million windfall premised on evidence its own agent destroyed, that ART took no steps whatsoever to preserve, and for which HiLo cannot evaluate the methodology or analysis.  *Karsch*, 2019 WL 2708125, at *20 ("Even where the spoliator has acted with mere negligence, it is well-established that, as between a negligent party and an innocent party, the former has no right to retain the fruits of their misconduct.").  Specifically, ART should be precluded from introducing into evidence: (i) the three 2021 Ascend valuation letters for which the underlying data was destroyed; (ii) any testimony about the methodology, inputs, outputs, or

---

[6] For the avoidance of doubt, sanctions are also appropriate under Rule 37(e)(2), given that an intent to deprive HiLo of the spoliated evidence can easily be inferred from the facts, including the failure to disclose the spoliation for years, the changing story from counsel for ART and Ascend once HiLo uncovered that the data had been destroyed, and the admitted violation of internal policies.  *Painadath v. Good Shepherd Penn Partners*, 348 F.R.D. 16, 27-29 (E.D. Pa. 2024) ("Intent can be demonstrated by circumstantial evidence, including the timing of erasure, method of deletion, selective preservation and (non)compliance with internal policies.").  However, because the remedies requested are necessary to address the prejudice caused by ART's spoliation under Rule 37(e)(1), the Court need not reach the question of ART's intent to deprive under Rule 37(e)(2).

assumptions of Ascend's 2021 work, which was likewise destroyed; and (iii) the 2025 "re-creation" effort and any work product derived from it, which was itself a result of ART's spoliation. *See Medcenter Holdings Inc. v. Web MD Health Corp.*, 734 F. Supp. 3d 303, 310 (S.D.N.Y. 2024) (precluding plaintiff, under Rule 37(e)(1), "from offering any evidence relying on or derived from the data that has been lost in the Salesforce Database," which prejudiced defendant's ability to test plaintiff's claims about its investigation); *Innis Arden Golf Club*, 257 F.R.D. 334 at 341 (ordering preclusion of evidence and citing with approval case where court sanctioned plaintiff with dismissal of the action for its expert's destruction of evidence because "an expert should not be permitted intentionally or negligently to destroy such evidence and then substitute his or her own description of it") (quoting *State Farm Fire & Casualty Co. v. Frigidaire*, 146 F.R.D. 160, 163 (N.D.Ill. 1992)); *Lokai Holdings LLC*, 2018 WL 1512055, at *17 (precluding testimony as to the content of any unpreserved emails).

HiLo recognizes that this is a serious sanction. But serious remedies are warranted to address the very serious loss resulting from ART's and Ascend's spoliation, which critically undermines these proceedings. HiLo has considered alternatives—for example, precluding ART from relying on any but Ascend's lowest valuation of $43 million, on the theory that without the spoliated data it is impossible to say that the higher valuations are more reasonable or reliable. But that does not actually address the issue here. Without the spoliated data, there is no basis to believe that the lowest of Ascend's numbers is any more reasonable or reliable than the others.[7]

---

[7] To be clear, even if the remedy were precluding ART from relying on or referencing the two higher valuations, which HiLo does not endorse, HiLo would still reserve all rights to challenge even the $43 million calculation as not commercially reasonable on a number of grounds, including those that are the subject of Mr. Adamson's testimony.

*Second*, ART should be precluded from offering Ascend's valuations, work product, or testimony as evidence of the alleged commercial reasonableness of ART's process for determining the Close-out Amount.  ART failed to preserve the data that is necessary to make that finding. Courts have recognized that "it would be unfair to defendants to require them to counter evidence as to the results of [an] investigation if they have been placed in the position of not having any access to that data."  *Medcenter Holdings Inc.*, 734 F. Supp. 3d at 311 (citation omitted) (precluding plaintiff from using "any aspect" of its investigation using the Salesforce Database, for which some data was lost, as "no greater than necessary to cure the prejudice" under Rule 37(e)(1)).  This "more serious measure" under Rule 37(e)(1) is appropriate where the destroyed data was uniquely in ART's and Ascend's control and its spoliation has materially impacted a central merits claim in this case.  *Karsch*, 2019 WL 2708125, at *12.

In the alternative, should the Court permit ART to present evidence regarding Ascend's calculations and work product as proof of the alleged commercial reasonableness of the Close-out Amount determination, then HiLo requests that the Court first reopen discovery for the limited purpose of allowing HiLo to probe (1) ART's communications with Ascend in 2021 and 2025, (2) the nature and scope of Ascend's 2025 re-creation efforts, and (3) ART's own internal methodologies used during the period of 2018 to the present for pricing and valuing PRS transactions, including the PRS at issue here.  The PRS provides that such internal procedures *could have been* a commercially reasonable way to calculate the Close-out Amount, but for some unexplained reason ART declined to use them.  If ART is permitted to present Ascend's unverifiable work product as evidence of purported reasonableness, then HiLo should at minimum be permitted to rebut such arguments with evidence demonstrating that ART's internal valuation

25

procedures do not comport with Ascend's practices, yield different results, or otherwise are inconsistent with ART's proffered evidence.

*Third*, the Court should permit HiLo to present evidence regarding ART's spoliation, and the Court should consider the circumstances of this lost evidence when evaluating witness credibility and making factual determinations. *See Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 68-69 (S.D.N.Y. 2020) (granting "sanctions of this nature" as they "ensure that the finder of fact will have the full context for the evidentiary imbalance that will become apparent at trial, 'which is itself relevant evidence going to the parties' credibility and other factual issues'") (citing *Karsch*, 2019 WL 2708125, at *27).

*Lastly*, the Court should award HiLo its reasonable attorneys' fees and costs, as well as the additional expert witness fees, that were incurred as a result of ART's spoliation, including those incurred (a) in attempting to obtain the underlying data through discovery, (b) for additional work by HiLo's attempting to evaluate and assess Ascend's incomplete work product and its "re-created" analyses (including the time spent by Mr. Adamson meeting with Ascend personnel in an effort to understand the methodology), and (c) in connection with this motion. Such fee-shifting is routinely granted on spoliation motions and is necessary to avoid placing the financial burden of ART's and Ascend's misconduct on HiLo. *Karsch*, 2019 WL 2708125, at *28; *Lokai Holdings*, 2018 WL 1512055, at *9.

## CONCLUSION

For the foregoing reasons, the Court should grant HiLo's motion for sanctions.

26

Dated:   May 22, 2026                    Respectfully submitted,
           New York, NY                   GIBSON, DUNN & CRUTCHER LLP

*/s/ Gabriel Herrmann*
Gabriel Herrmann
Rahim Moloo
Esther Lifshitz
200 Park Avenue, 47th Floor
New York, NY 10166
Telephone: (212) 351-4000
gherrmann@gibsondunn.com
rmoloo@gibsondunn.com
elifshitz@gibsondunn.com

Peter M. Wade
1700 M Street, N.W.
Washington, DC 20036
Telephone: (202) 777-9529
pwade@gibsondunn.com

*Attorneys for Defendant High Lonesome Wind Power, LLC*

27

## WORD COUNT CERTIFICATION

I certify that this Memorandum of Law complies with the formatting requirements and word limits set forth in Local Civil Rule 7.1(c).  Excluding the caption, index, table of contents, table of authorities, signature blocks, and this certification, in accordance with Local Civil Rule 7.1(c), this Memorandum contains 8,548 words.  In making this certification, I relied on the word count feature in Microsoft Word.

Dated:    May 22, 2026
         New York, NY                                        */s/ Gabriel Herrmann*

                                       Gabriel Herrmann
                                       200 Park Avenue
                                       New York, NY 10166
                                       Telephone: (212) 351-4000
                                       Email:  gherrmann@gibsondunn.com

                                       *Attorney for High Lonesome Wind Power, LLC*