USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/9/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**-----------------------------------------------------------------X**

**ALLIANZ RISK TRANSFER (BERMUDA) LIMITED,**

**Plaintiff,**

**-against-**

**HIGH LONESOME WIND POWER LLC,**

**Defendant.**
**-----------------------------------------------------------------X**

**22-CV-5133 (GHW)(SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

Defendant High Lonesome Wind Power, LLC ("HiLo") moves under Federal Rule of Civil Procedure 37(e) for sanctions arising from the loss of electronically stored information ("ESI") created by non-party Ascend Analytics, LLC ("Ascend"). Plaintiff Allianz Risk Transfer (Bermuda) Limited ("ART") retained Ascend to calculate the approximately $75 million Close-out Amount ART seeks in this action but Ascend did not preserve certain input and output files underlying its valuation.

HiLo contends that the missing files prevent it from testing whether ART calculated the Close-out Amount using commercially reasonable procedures. It principally seeks preclusion of Ascend's valuations and related evidence, or, alternatively, additional discovery and monetary relief. ART responds that Ascend substantially recreated the lost information and that HiLo has not suffered prejudice warranting sanctions.

For the reasons that follow, HiLo's motion is GRANTED.

# BACKGROUND

## I. Factual Background

### A. The Proxy Revenue Swap and Close-out Amount

HiLo owns a wind energy project in Texas. In 2019, HiLo and ART entered into a ten-year Proxy Revenue Swap ("PRS") relating to that project. ECF No. 106 ¶ 312. The PRS required ART to pay HiLo a fixed quarterly payment of $5,177,000 netted against a "floating payment" equal to HiLo's "Proxy Revenue," rather than its actual revenue. ECF No. 109-1. Proxy Revenue was calculated by multiplying "Proxy Generation," derived from wind-speed data, by market electricity prices determined by the Electric Reliability Council of Texas ("ERCOT"). ECF No. 106 ¶ 11. If Proxy Revenue fell below the fixed quarterly payment of $5,177,000, ART was required to pay the difference to HiLo. If Proxy Revenue exceeded the fixed payment, HiLo paid ART the excess.

In February 2021, severe winter weather affected Texas. Although HiLo's turbines could not operate under the resulting temperature and ice conditions, Proxy Revenue continued to accrue under the contractual formula because the PRS used proxy generation rather than actual generation. ECF Nos. 43 ¶¶ 45-47; 47 ¶¶ 45-47. At the same time, ERCOT market prices increased to the regulatory maximum of $9,000 per megawatt hour. ECF No. 89 at 5. REsurety, Inc., the parties' Calculation Agent, calculated that HiLo owed a Cash Settlement Amount of approximately $129.8 million for the first quarter of 2021. HiLo disputes that amount, and that dispute has been submitted to an Independent Consultant pursuant to the PRS. ECF Nos. 43 ¶¶ 46–47; 47 ¶¶ 46–47, 55.

After several months of back-and-forth disputes over the $129.8 million payment, each party separately claimed to have validly terminated the PRS. HiLo noticed its termination of the

PRS on July 19, 2021, ECF No. 109-39, while ART "designated" August 14, 2021, as its termination date. ECF No. 109-100 at 2. Which party validly terminated the PRS, and the consequences of that determination, are the subject of pending summary judgment motions. ECF No. 89; 112. If ART validly terminated the PRS, it claims an "Early Termination Amount," consisting of unpaid settlement amounts and a "Close-out Amount." ECF No. 109-52 §§ 6(e)(i). The PRS defines the Close-out Amount by reference to the losses, costs, or gains associated with replacing, or providing the economic equivalent of, the material terms of the terminated transaction. ECF No. 109-52 § 14. In practical terms, the Close-out Amount estimates the payments the parties would have exchanged based on forecasted Proxy Revenue, during the remaining term of the PRS. The PRS does not provide for an exact methodology for determining the Close-out Amount but requires that the determining party "act in good faith" and calculate the Close-out Amount "us[ing] commercially reasonable procedures in order to produce a commercially reasonable result." Id.

**B. Ascend's 2021 Valuation**

In August 2021, ART retained Ascend to forecast Proxy Revenue over the remaining term of the PRS for the period from August 14, 2021 (the ART termination date) through June 30, 2030 (the PRS termination date). ECF No. 155-1 at 3. Ascend understood that the engagement concerned a contractual dispute and that litigation between the parties was possible. ECF No. 139-1 at 43. Ascend's contemporaneous communications referred to the engagement as "Litigation Support" and described its objective as providing ART with a "defensible valuation" for a potential litigation process. ECF Nos. 109-47, 109-48.

Ascend performed its analysis using a proprietary model known as PowerSIMM. According to Ascend, PowerSIMM consists of millions of lines of code and operates through a

computing architecture that includes a database-management software supplied by Oracle. ECF No. 85 ¶¶ 7, 20. Ascend created an "input file" containing historical data and several hundred parameters and assumptions concerning matters including weather, electricity prices, market conditions, and the project's historical generation. Ascend then loaded the input file into PowerSIMM, which generated raw output data that Ascend used to calculate forecasted Proxy Revenue. ECF No. 109-50 at 2.

Over approximately two weeks, Ascend provided ART with three valuation memoranda. On August 18, 2021, Ascend valued the remaining term of the PRS at approximately $91.5 million. ECF No. 109-82. On August 22, 2021, it produced a valuation of approximately $43.9 million. ECF No. 109-79. On August 27, 2021, it produced a valuation of approximately $77.8 million. ECF No. 109-105 at -7397. Each memorandum was signed by Ascend CEO Gary Dorris and described the stated result as a "fair and accurate valuation." ART ultimately selected the third valuation, with a discount to present value, to arrive at its final demand of $75 million for the Close-out Amount. ECF No. 109-100 at 2. Dorris further testified as to the differences in each valuation, explaining that each valuation was a result of using different data sets and the removal of a correlation constraint in the final forecast. ECF No. 155 ¶¶ 8-9.

**C. The Loss of Ascend's 2021 Data**

During discovery, HiLo sought from ART the data underlying the Close-out Amount and subpoenaed Ascend for the documents and data considered or relied upon in its analysis. On March 20, 2025, Ascend agreed to produce the responsive underlying materials. ECF No. 109-104 at 7-8.

HiLo subsequently identified apparent gaps in Ascend's production concerning certain data underlying the analysis along with the missing input file and raw output files. On June 12,

2025, ART responded by pointing to an Excel workbook that purportedly reflected Ascend's analysis of the Close-out Amount. ART also advised that, although Ascend ordinarily retained the "input" file used to generate the raw output data, the input file had been corrupted during an August 2024 cyberattack. ECF No. 163-1 at 2. ART further stated that Ascend could attempt to recreate the input and raw output data files, a process it estimated would take approximately five weeks. Id.

ART later informed HiLo that Ascend had learned that the input file was not affected by the 2024 cyberattack but instead had been accidentally deleted in March 2023 during a computer-system upgrade. ECF No. 164-3 at 2. ART stated that it had not authorized the deletion and had no reason to believe that Ascend would not maintain the data underlying its analysis in the ordinary course. Id.

Finally, on August 15, 2025, counsel for Ascend and ART disclosed that the input file was actually marked for deletion by a former employee during a company-wide migration to a new database-management system. ECF No. 109-49 at 4. In the same correspondence, counsel explained that Ascend did not ordinarily retain raw output data files generated by PowerSIMM because doing so would increase data-storage costs. Dorris later declared, however, that the deletion of both the input file and the raw output data files was "contrary to Ascend's document retention policy and instructions to Ascend personnel . . . about how to preserve data related to our work for ART, and it should not have happened." ECF No. 155 ¶10. Dorris also testified that ART provided no "explicit instructions" to Ascend with respect to data preservation at the outset of the engagement or after litigation was filed. Ex. 107 at 170.

Ascend also retains the source code corresponding to the version of PowerSIMM used in 2021. ART represents, however, that the 2021 version can no longer be operated because Oracle

has since updated the database-management software on which PowerSIMM depends, and the earlier version of the model is incompatible with the current Oracle environment. ECF Nos. 85 ¶¶ 20-21; 155 ¶ 22. HiLo contends that Ascend could have preserved an operable version of the relevant model and database environment.

**D. Ascend's 2025 Recreation**

After disclosing the loss of the input and raw output data file to HiLo, Ascend attempted to recreate both files. That effort lasted approximately two months. Ascend prepared a new input file and reran its forecast using the then-current version of PowerSIMM. The analysts who performed the recreation had not worked on the original valuation and were not employed by Ascend in 2021, although Dorris represents that he supervised both the original valuation and the recreation. ECF No. 155 ¶ 11.

According to ART, Ascend knew which categories of inputs to use because it uses standardized inputs when performing forecasts of this nature and reviewed documents produced in this litigation concerning the original 2021 forecast to confirm those inputs. ECF No. 155 ¶¶ 14, 16. Ascend first produced an Excel spreadsheet titled "High Lonesome – Model Inputs," which Dorris identified at his deposition as "the recreated input file that Ascend undertook to create" for this litigation. ECF No. 163-4 at 17. HiLo represents that nine days after Dorris's deposition, ART produced a separate native input file in .dmp format containing approximately fifteen gigabytes of data. ECF No. 162 at 6-7; ECF No. 155 ¶ 17. ART now identifies that .dmp file as the native recreated input file. ECF No. 164-5 at 2. Ascend also produced recreated raw output data. ECF No. 155 ¶ 18.

The recreated analysis did not produce the same overall valuation as Ascend's August 2021 final forecast. The recreated analysis produced a result of approximately $80.22 million,

compared with the approximately $77.8 million final 2021 valuation. ECF No. 110-1 ¶ 55. ART nevertheless contends that the recreation substantially replicated the original forecast: according to ART, the generation forecast was reproduced exactly and the forecasted average monthly Proxy Revenue differed by less than one percent. ECF No. 155 ¶ 16. ART attributes the remaining differences to routine updates to PowerSIMM and its related computing architecture between 2021 and 2025. ECF No. 85 ¶ 19.

**E. This Motion**

Fact discovery closed on September 22, 2025. HiLo thereafter provided the recreated materials and other Ascend discovery to its expert, Seabron Adamson, who addressed in his expert analysis the extent to which the loss of the original data affected his ability to evaluate Ascend's 2021 valuation. ART has not offered its own expert to support its Close-out Amount, opine on Ascend's valuation methodology or the commercial reasonableness of its forecast, or rebut Adamson's opinions. Instead, it intends to rely solely on Ascend's 2021 valuation and Dorris's testimony to establish the Close-out Amount. Expert discovery closed on November 14, 2025. The parties then proceeded to summary judgment briefing. HiLo represents that, when it moved for summary judgment, it asked ART to meet and confer concerning a potential spoliation motion, but ART did not respond.

On March 10, 2026, HiLo sought leave to move for sanctions under Rule 37(e). ECF No. 117. After a pre-motion conference, HiLo filed its motion for sanctions on May 22, 2026. ECF No. 138.

## DISCUSSION

### I. The Motion is Timely

As a threshold matter, ART argues that HiLo's motion should be denied as untimely. Although Rule 37 does not establish a deadline for seeking sanctions, an unreasonable delay in raising alleged discovery misconduct may render a sanctions motion untimely. In re Terrorist Attacks on September 11, 2001, No. 03-md-1570 (GBD)(SN), 2018 WL 4096106, at *2 (S.D.N.Y. Aug. 27, 2018).

The timing of HiLo's motion is not unreasonable under the circumstances. ART and Ascend first disclosed in June 2025 that the original files were unavailable. HiLo thereafter pursued the issue through discovery and agreed to postpone the deposition of Ascend's CEO while Ascend attempted to recreate the missing data. That process resulted in additional productions continuing into September 2025, after which HiLo deposed Dorris and provided the resulting materials to its expert for evaluation. HiLo then raised the prospect of a sanctions motion as the parties proceeded to summary judgment and filed its pre-motion letter on March 10, 2026. No trial has been scheduled.

ART emphasizes that HiLo did not seek relief from the Court until after fact and expert discovery had closed and summary judgment briefing had begun. ECF No. 154 at 32–33. But the sanctions motion turns in substantial part on whether Ascend's recreation adequately replaced the missing information and the extent to which the loss prejudiced HiLo. It was reasonable for HiLo to permit the recreation to proceed and to assess the resulting materials before seeking sanctions. The circumstances therefore differ from cases in which a party knew of the alleged misconduct but waited until trial or long after the relevant discovery dispute could have been addressed. Accordingly, the Court declines to deny HiLo's motion as untimely.

## II. Legal Standard for a Spoliation Motion

Because this specific pretrial motion for sanctions was referred to me pursuant to 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(a), I have broad authority to impose discovery sanctions. Orders imposing such sanctions "are ordinarily considered non-dispositive and therefore fall within the grant of Rule 72(a), 'unless the sanction employed disposes of a claim.'" Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16-cv-1318 (GBD) (BCM), 2017 WL 3671036, at *16 (S.D.N.Y. July 18, 2017).

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). A district court has the authority to impose sanctions on a party for spoliation, but when the lost evidence consists of ESI, the sanctions analysis is governed by Rule 37(e). See Barbera v. Gariled, LLC, No. 24-cv-3535 (LJL), 2025 WL 2098635, at *10 (S.D.N.Y. July 25, 2025).

Rule 37(e) authorizes sanctions for the spoliation of ESI that (i) should have been preserved but (ii) is lost because a party failed to take reasonable steps to preserve it, and (iii) the ESI "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If a party failed to preserve the ESI, upon finding prejudice to the other party, the court may "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1); see also Europe v. Equinox Holdings, Inc., 592 F. Supp. 3d 167, 175 (S.D.N.Y. 2022). The court may impose a "broad" range of measures to address the Rule's purpose. See Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. These include monetary sanctions as well as more "serious measures . . .such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury

regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument. . . .” Id.

The Court may impose more severe remedies only if it finds that the responsible party “acted with the intent to deprive another party of the information’s use in the litigation.” Fed. R. Civ. P. 37(e)(2). Thus, “[c]are must be taken . . . to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2) . . . .” See Fed. R. Civ. P. 37(e) advisory committee’s note to 2015 amendment. If the court finds that a party acted with the intent to deprive another party of the lost information’s use in the litigation, the court may presume that the lost information was unfavorable, instruct a jury that it may or must so presume, or dismiss the action or enter a default judgment. Id. The intent required by subsection (e)(2) is more than negligence or even gross negligence; the Rule requires a specific intent to deprive another party of the information’s use in litigation. See Fed. R. Civ. P. 37(e) advisory committee’s note to 2015 amendment.

## III. Failure to Preserve ESI

The first step of the Rule 37(e) framework requires the moving party “to demonstrate that the spoliating party had an obligation to preserve the evidence at the time it was destroyed.” Leidig v. Buzzfeed, Inc., No. 16-cv-542 (VM) (GWG) 2017 WL 6512353, at *8 (S.D.N.Y. Dec. 19, 2017) (citation and quotation marks omitted). In evaluating this factor, “[c]ourts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant.” Fed. R. Civ. P. 37(e) advisory committee’s note to 2015 amendment. The obligation to preserve evidence arises “most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the

evidence may be relevant to future litigation." Kronisch v. United States, 150 F.3d 112, 126-27 (2d Cir. 1998) (citations omitted).

ART does not dispute that the 2021 input and raw output files should have been preserved or that its preservation obligation extended to the data maintained by Ascend. Although Ascend is a non-party and maintained the files on its own systems, ART retained Ascend to perform a valuation for use in a dispute that both entities understood was likely to result in litigation. ART directed Ascend's valuation work, later directed Ascend's recreation effort, and was able to obtain Ascend's recreated files for production in this litigation. Under these circumstances, ART had the practical ability to obtain the relevant information from Ascend. See GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 355 (S.D.N.Y. 2012).

ART contends, however, that Ascend took reasonable steps to preserve those materials. Once the duty to preserve attaches, counsel's "obligations extend further than simply advising her clients as to what documents might be necessary in the litigation." Cruz v. G-Star, Inc., No. 17-cv-7685 (PGG), 2019 WL 4805765, at * 12 (S.D.N.Y. Sept. 30, 2019). Counsel must also "'become fully familiar with her client's document retention policies as well as the client's data retention architecture.'" Id. (quoting Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 432 (S.D.N.Y. 2004)). Accordingly, a party must do more than rely on the existence of a document-retention policy; it must take reasonable steps to ensure that relevant ESI is identified, preserved, and protected from routine deletion. Moreover, "[c]ounsel cannot just implement a litigation hold and then sit on his hands, hoping that parties retain and produce all relevant information." Ryan v. Rock Grp., NY Corp., No. 18-cv-2600 (GHW), 2019 WL 6841874, at *4 (S.D.N.Y. Dec. 16,

2019). Rather, the Federal Rules of Civil Procedure "obligate counsel to monitor compliance so that all sources of discoverable information are identified and searched." Id.

Applying these principles, the Court finds that ART failed to take reasonable steps to ensure the preservation of the input and raw output files underlying Ascend's 2021 valuation. When ART retained Ascend, both entities understood that its forecast was reasonably likely to be used in litigation against HiLo. Nevertheless, ART did not issue a litigation hold notice to Ascend.

ART responds that Ascend maintained internal data-retention policies and that the project team was instructed to store documents in a location where they could not be accessed by others. ART further represents that those instructions specifically referred to the input and raw data files and "served the same purpose as a litigation hold." ECF No. 154 at 28. The Court disagrees. "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). The record does not reflect that either entity took steps specifically directed toward suspending Ascend's ordinary deletion practices either via a litigation hold or otherwise.

Even if Ascend's internal instructions served the same purpose as a litigation hold, issuing preservation instructions alone was insufficient. A party and its counsel may not simply issue preservation instructions and assume that they will be followed; they must become familiar with the relevant document-retention systems and monitor preservation efforts. Charlestown Capital Advisors, LLC v. Acero Junction, Inc., 337 F.R.D. 47, 62 (S.D.N.Y. 2020). The record does not show that ART took any steps to determine how Ascend maintained the data underlying that forecast, to ensure that Ascend suspended its ordinary deletion practices, or to monitor

Ascend's compliance with its preservation obligations. Indeed, ART expressly argues that it was "reasonable . . . to rely on Ascend to preserve those files" because neither the input file nor the raw output files were typically provided to Ascend's clients. Id. That reliance, without further inquiry or oversight, was not reasonable under the circumstances.

HiLo separately contends that Ascend failed to preserve an operable version of the PowerSIMM model used to perform the 2021 analyses. Ascend continues to possess the source code corresponding to the 2021 version of PowerSIMM, but that version can no longer be operated because the Oracle database environment on which it depended has since changed. ECF Nos. 85 ¶¶ 20–21; 155 ¶ 22. Dorris testified that a version of the model could have been preserved for later use, but ART maintains that such preservation would not have allowed the model to remain operable after Oracle upgraded the supporting database software. ECF No. 154 at 22-23 & n.6.

The record therefore raises a question as to whether even reasonable preservation efforts would have permitted HiLo to run the 2021 model after Oracle upgraded its software. Because of this factual uncertainty, and because it is not dispositive to the Court's ruling, the Court declines to find that the failure to preserve an operable version of the 2021 PowerSIMM environment constitutes an independent loss of ESI under Rule 37(e).

**IV. Prejudice**

Rule 37(e)(1) requires a finding of prejudice for the Court to issue sanctions. Fed. R. Civ. P. 37(e)(1). The Rule "does not assign either party the burden of proving or disproving prejudice," but instead "leaves judges with discretion to determine how best to assess prejudice in particular cases." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.

ART maintains that the loss of the 2021 input and raw output files caused no prejudice because Ascend substantially recreated the missing information in 2025. Relying on the advisory committee's observation that "loss from one source may often be harmless when substitute information can be found elsewhere," ART argues that the recreated fields serve the same purpose as the originals by permitting HiLo to test Ascend's valuation methodology. ECF No. 154 at 31. This is only moderately true.

The 2025 recreation does not restore or replace the information contained in the original 2021 files. The recreated input file is not a recovered copy of the file used in 2021. It was assembled approximately four years later by different Ascend personnel based on standardized categories of inputs and documents concerning the original forecast. And because the 2021 PowerSIMM environment is no longer operable, Ascend performed the recreation using the then-current version of PowerSIMM and its supporting computing architecture. The resulting valuation – approximately $80.22 million – also did not replicate any of Ascend's three 2021 valuations.

ART emphasizes that the similarities between the original and recreated analyses were substantial. According to Dorris, the recreation reproduced Ascend's original generation forecast exactly and forecasted average monthly Proxy Revenue differed by less than one percent. ART attributes that difference to routine changes to PowerSIMM and its computing architecture between 2021 and 2025. ECF No. 154 at 20–21. Those similarities suggest that the recreation approximates Ascend's final 2021 analysis. But they do not establish the precise inputs, parameters, and assumptions actually used in 2021, nor do they recreate the raw outputs actually generated by those inputs. And, critically, there is no evidence in the record to demonstrate that the recreation exercise was aimed at faithfully reproducing the content of the input file rather

than just working backwards from ART's damages claim to generate a new input file that would yield the 2021 result.

Under these circumstances, HiLo is left with little opportunity to test or rebut Ascend's assumptions, reconcile the three 2021 valuations, or meaningfully cross-examine Ascend's witnesses. In short, the lost ESI interferes with HiLo's ability to challenge whether ART used "commercially reasonable procedures" to "produce a commercially reasonable result." The importance of the missing input file is underscored by the substantial variation among Ascend's three 2021 valuations: approximately $91.5 million, $43.9 million, and $77.8 million over a period of less than two weeks. Without the original input and raw output files, HiLo cannot independently determine the precise assumptions and parameters used in each analysis or fully test Ascend's present explanation for the differences among those valuations. That inability to verify the contemporaneous analyses may bear on the reliability of Ascend's valuation and on whether ART has established that the Close-out Amount was calculated using commercially reasonable procedures.

The prejudice, however, is mitigated slightly by the information available to HiLo. Ascend produced the 2025 recreated input and raw output files, contemporaneous documents and communications concerning the 2021 forecasts, and substantial underlying market and historical data. Dorris was deposed concerning Ascend's methodology and the differences among the three valuations. And HiLo's expert, Seabron Adamson, has been able to identify and challenge specific assumptions used by Ascend, including its assumptions concerning a carbon tax and federal tax credits. Thus, although the loss prevents HiLo from independently verifying every input and output used in the original analyses, HiLo has still challenged Ascend's methodology on the merits through its expert witness.

Finally, ART argues that HiLo's expert lacked the technical capability to access the native .dmp format in which Ascend maintains its input files. ECF No. 154 at 34. HiLo responds that Adamson reviewed the Excel spreadsheet that Dorris identified as the recreated input file and that the recreated .dmp file was not produced until after Dorris's deposition. ECF No. 162 at 2–3. Although the circumstances surrounding the production of the recreated .dmp file diminish the significance of Adamson's failure to review that particular file, HiLo does not squarely dispute ART's contention that Adamson lacked the technical capability to access a .dmp file. This further mitigates the prejudice resulting from the loss of the original input file, although it does not eliminate the loss of the contemporaneous 2021 data or establish that HiLo could have made no use of that information had it been preserved.

Accordingly, the Court finds that the original 2021 input and raw output files cannot be fully restored or replaced through additional discovery and that their loss has prejudiced HiLo.

**V. Remedy**

Having found prejudice from the loss of the 2021 input and raw output files, the Court must determine what measures are necessary to cure that prejudice. Rule 37(e)(1) authorizes only measures "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Accordingly, courts should impose the "least harsh sanction that can provide an adequate remedy." Equinox Holdings, Inc., 592 F. Supp. 3d at 175. The rule also does not require a court "to adopt measures to cure every possible prejudicial effect." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. Rather, "the severity of given measures must be calibrated in terms of their effect on the particular case." Id.

HiLo principally asks the Court to preclude ART from offering Ascend's three 2021 valuations, testimony concerning the methodology and assumptions underlying those valuations,

and the 2025 data recreation. ECF No. 138 at 23–25. HiLo argues that this remedy is proportionate to the prejudice because the Close-out Amount is the "central issue in this case." Id. at 20.

This remedy, however, encroaches too closely into curative measures permitted only under subdivision (e)(2) after a finding that ART acted with the intent to deprive HiLo of the lost information. If it were granted, ART would have no evidence to support its Close-out Amount claim. Thus, while Rule 37(e)(1) may permit evidentiary preclusion in appropriate circumstances, a measure that has the practical effect of resolving a claim against the spoliating party is not warranted where the Court has not made an "intent to deprive" finding.[1]

Moreover, HiLo has been able to challenge the reasonableness of the 2021 valuation, at least in part, based on the discovery it has received and the ability to the highlight the significance of the missing data. HiLo has received substantial contemporaneous documentation concerning Ascend's work, the 2025 recreated input and raw output files, and testimony from Dorris regarding Ascend's methodology. HiLo's expert has also identified and challenged substantive aspects of Ascend's analysis. Precluding ART's valuation evidence altogether would therefore go beyond what is necessary to cure the prejudice caused by the missing files. The inability to verify the original inputs may well bear on the weight, reliability, or commercial reasonableness of Ascend's valuation, but those merits questions are presented in the pending summary judgment and expert-related proceedings before Judge Woods. If the case proceeds to trial, the factfinder should consider the significance of the missing files.

[1] HiLo does not seek the sanctions enumerated in Rule 37(e)(2) but contends that the record would nevertheless support a finding that ART or Ascend acted with an intent to deprive HiLo of the lost information. ECF No. 138 at 23 n.6. The Court disagrees. The record supports a finding that ART and Ascend failed to take reasonable preservation steps, but it does not establish that either acted for the purpose of depriving HiLo of evidence in this litigation.

Limited additional discovery, however, is warranted. HiLo seeks discovery concerning ART's communications with Ascend in 2021 and 2025 and the nature and scope of Ascend's recreation efforts. That discovery is sufficiently connected to the prejudice caused by the loss of the original files. The 2025 recreation is central to ART's contention that the missing information has been substantially replaced, yet HiLo represents that neither ART nor Ascend has produced communications reflecting how that recreation was conducted. The Court therefore directs ART to produce communications between ART and Ascend concerning the 2025 recreation, including communications concerning the information provided to Ascend, the selection or modification of inputs and assumptions, the performance of the recreated analysis, and any intermediate or alternative results. To the extent not already produced, ART shall also produce any communications between ART and Ascend concerning the inputs, assumptions, parameters, or changes among Ascend's three 2021 valuations.

The Court does not order discovery concerning ART's internal methodologies for pricing or valuing PRS transactions from 2018 to the present. HiLo seeks such discovery on the theory that ART's internal valuation practices may differ from Ascend's methodology. ECF No. 138 at 30. That discovery bears on the merits of whether ART's Close-out Amount was commercially reasonable, but it is not sufficiently tied to the particular prejudice caused by the loss of Ascend's 2021 input and output files to constitute an appropriate remedy under Rule 37(e)(1).

Finally, ART shall bear the reasonable attorney's fees and costs incurred by HiLo as a result of the loss of the 2021 files. This includes reasonable fees and costs incurred in discovering and investigating the loss, seeking the missing ESI or substitute information, evaluating Ascend's recreation to the extent that such work was necessitated by the loss, conducting the supplemental discovery authorized by this Order, and preparing and litigating the

present motion for sanctions. It does not include expenses HiLo would have incurred in the ordinary course in evaluating Ascend's valuation or litigating the commercial reasonableness of the Close-out Amount.

The parties shall meet and confer in good faith in an effort to reach agreement as to the amount of fees and costs to be awarded. If they are unable to reach agreement, the parties shall file a letter within 14 days of the completion of the supplemental discovery proposing a reasonable schedule for submission of its fee application and ART's response.

These measures adequately address the prejudice resulting from ART's failure to preserve the original input and raw output files without placing HiLo in a better position than it would have occupied had the information been preserved. The Court therefore denies HiLo's request for preclusion and broader reopening of discovery and grants its motion only to the extent set forth above.

**CONCLUSION**

HiLo's motion for sanctions is GRANTED. ART shall produce the limited communications between ART and Ascend identified above within 30 days. ART shall also bear the reasonable attorney's fees and expert costs incurred by HiLo as a direct result of the investigation into the loss of the 2021 files and the supplemental discovery ordered herein.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 137, 167, and 168.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED: September 9, 2026
New York, New York